John **OXENDINE** and Beulah **Oxendine**, **Defendants-Appellants,**

v.

**PUBLIC SERVICE COMPANY OF INDIANA, INC., Plaintiff-Appellee,**

Fernn L. **HIGGENBOTHAM,** **Defendant-Appellant,**

v.

**PUBLIC SERVICE COMPANY OF INDIANA, INC., Plaintiff-Appellee.**

No. 1–480A98.

Court of Appeals of Indiana, First District.

Aug. 26, 1980.

Benjamin F. Crawford, Felling, Crawford & Wagner, Max E. Goodwin, Mann, Chaney, Johnson, Hicks & Goodwin, Terre Haute, for defendants-appellants.

Raymond H. Modesitt, Patrick, Gabbert, Wilkinson, Goeller & Modesitt, Terre Haute, Frank T. Lewis, Plainfield, for plaintiff-appellee.

## MEMORANDUM DECISION

NEAL, Judge.

### STATEMENT OF THE CASE

This is a consolidated interlocutory appeal by defendants-appellants (Landowners) from adverse judgments in two eminent domain actions, consolidated for trial, brought by Public Service Company of Indiana, Inc. (PSI), wherein the trial court overruled the landowners' objection to the taking and ordered the appropriation of an easement for a transmission line across two properties in favor of PSI. Appellants John Oxendine and Beulah Oxendine are the owners of one parcel and appellant Fernn L. Higgenbotham is the owner of the other one.

We affirm.

### STATEMENT OF THE FACTS

PSI is a public electric utility engaged in the business of generating, transmitting, distributing, and selling electricity. It determined to build a new 345,000-volt transmission line from its generating station in Gibson County to its generating station in Vermillion County. The line is not a service line for customers, but PSI claims that it is necessary to insure the stability of the Gibson County generating plant and to insure the reliability of the PSI network system of electricity distribution to its customers in Indiana. PSI selected a route for the new transmission line which crossed the appellants-landowners' two properties. Negotiations for the purchase of the easements failed and PSI instituted the eminent domain actions which are the subject of this appeal. The easements are each 150 feet wide and run 1,967 feet on the Oxendine

property and 2,544 feet on the Higgenbotham property.

## ISSUES

Landowners have preserved for review the following issues:

I. Whether PSI proved by sufficient evidence that the transmission line is needed for a proper public purpose.

II. Whether selection of and adherence to the route across the Oxendine and Higgenbotham properties constitutes a clear abuse of PSI's discretion.

III. Whether PSI proved by sufficient evidence that it made good faith, adequate precondemnation offers to purchase a right-of-way across the properties, in that the amounts offered were not shown to be based on the actual characteristics of the particular land and improvements.

IV. Whether PSI's precondemnation offers complied with the 1977 amendments to the 1905 Eminent Domain Act, Ind. Code 32–11–1–2.1 (Supp.1979), in that they were not proved to be based on good faith opinions of fair market values.

V. Whether PSI's precondemnation offers complied with Ind.Code 32–11–1–2.1, in that PSI did not adhere to the uniform offer form mandated by that statute, but instead added to the statutory form a proposed agreement calculated to release other claims or settle other disputes between the parties.

VI. Whether the trial court erroneously quashed subpoenas for PSI's construction budgets for the transmission line, in that the budgets would have constituted evidence of PSI's opinion of when the line will actually be needed.

VII. Whether the trial court abused its discretion by refusing to permit supplemental evidence showing a substantial drop in peak demand by PSI's Indiana customers for the winter of 1979–1980.

VIII. Whether permitting a corporation whose primary purpose is to make a profit to forcefully take private property of Indiana citizens in the manner shown by the record here would be consistent with basic constitutional principles.

*Issue I.*

Landowners raise the issue of whether PSI proved by sufficient evidence that the Gibson to Dresser transmission line is *needed* for a *proper public purpose*, making a two-pronged argument under the emphasized language. They contend: 1) that PSI did not prove an actual present or future need for the line but only a remote and speculative need; and 2) that PSI failed to show a proper public purpose for the line in that the evidence shows that it is to be used not to serve the needs of Indiana residents but to supply electricity to "other power companies not parties to the action, and for the most part outside Indiana." PSI submits that the evidence is more than sufficient to justify findings that PSI has a present need for this transmission line to insure the reliability of its network system of distribution and the stability of the Gibson generating station, and that such needs constitute a public purpose.

Ind.Code 32–11–3–2 provides:

"The condemnor may take, acquire, condemn and appropriate a fee simple estate, title and interest in such quantity or amount of land *as it deems necessary for its proper use and purposes*, except that for rights-of-way, the condemnor shall take, acquire, condemn and appropriate an easement." (Emphasis added.)

The Supreme Court said in *Dahl v. Northern Indiana Public Service Company*, (1959) 239 Ind. 405, 410–11, 157 N.E.2d 194:

"The rule applicable here is succinctly stated in *Guerrettaz v. Public Service Co. of Ind.* (1949), 227 Ind. 556, at page 561, 87 N.E.2d 721, as follows:

'All questions concerning the expediency of taking private property for public use are exclusively for the legislature. Unless the action of the legislature is arbitrary, and the use for which the property is taken is clearly private, the courts will not interfere.'

In *Slentz et al. v. City of Fort Wayne et al.* (1954), 233 Ind. 226, at page 231, 118

N.E.2d 484, this court reaffirmed the general rule which has long been established and consistently followed in Indiana, quoting from *Bragg v. Weaver* (1919), 251 U.S. 57, 40 S.Ct. 62, 64 L.Ed. 135, as follows:

' "Where the intended use is public, the necessity and expediency of the taking may be determined by such agency and in such mode as the state may designate. They are legislative questions, no matter who may be charged with their decision, and a hearing thereon is not essential to due process in the sense of the 14th Amendment. (Citing authorities.)" '

And, further, at page 232 of 233 Ind. [118 N.E.2d 484]:

'The necessity and expediency of taking property for public use is a legislative and not a judicial, question.' (Citing authorities.)

The statute vests discretion in the appellee, utility, herein, to take or appropriate property for public use, and if in its judgment the property herein sought to be appropriated was necessary to distribute electric energy to the public, appellee had the right to condemn, and its judgment therein cannot be questioned or superseded by the courts except for fraud, capriciousness or illegality. [Citations omitted.]"

The contention here is not that PSI's taking was fraudulent or capricious, but that it was unlawful in the sense defined by the Supreme Court in *Country Estates, Inc. v. Northern Indiana Public Service Company,* (1970) 254 Ind. 108, 258 N.E.2d 54, and *Meyer v. Northern Indiana Public Service Company,* (1970) 254 Ind. 112, 258 N.E.2d 57, a taking for a remote or speculative purpose. In *Meyer,* the utility's engineer speculated that sometime in the future, maybe as much as six to ten years in the future, there would possibly be a necessity for an additional line. The court termed this a purely speculative future need and not the basis for a lawful taking.

■ On the other hand, a utility's determination of necessity may be based upon either a present immediate need or a fair and reasonable future need. *Ellis v. Public Service Company of Indiana, Inc.,* (1976) 168 Ind.App. 269, 342 N.E.2d 921.

Specifically, the trial court found the transmission line necessary to: 1) allow PSI to reliably furnish electrical energy required by its customers in Indiana; 2) insure the stability of PSI's generating station in Gibson County; and 3) insure the reliability of PSI's network system of electrical distribution to its customers in Indiana.

■ In reviewing the sufficiency of the evidence to support a conclusion that the taking was necessary for a present immediate need or a fair and reasonable future need, we cannot weigh conflicting evidence nor resolve questions concerning the credibility of the witnesses, but must consider only that evidence most favorable to the prevailing party together with all reasonable inferences to be drawn therefrom. If from that viewpoint, there is evidence of probative value to sustain the trial court, its findings and judgment will not be disturbed. *Indiana and Michigan Electric Company v. Schnuck,* (1973) 260 Ind. 632, 298 N.E.2d 436.

PSI Systems Planning Manager James Benning testified the proposed line is necessary to enhance and insure the stability of the Gibson generating station in line with the East Coast electrical distribution network and to insure the reliability of the PSI network.

He testified an outage in August, 1978, was largely due to the fact this line was not in service. Two existing lines were rendered inoperative by a falling tree and a malfunctioning switch, causing an overload on the system which was incomplete because this line was not completed in 1977 as originally planned. The resulting cascading effect rendered the entire Gibson generating station inoperative, causing a total loss of power from the station and damage to its generating units. Two days were required to restore normal operations during which time PSI had to purchase power re-

quired to service its customers from other utilities. Benning testified that if this line had been in service, the overload would not have occurred and normal operations would have continued.

He further testified that a fifth and final generating unit was under construction and its completion would further increase the need for this line. The Gibson station was originally planned to include five generating units and six transmission lines. In the absence of this sixth and final line, the loss of any single line could cause the cascading effect described above.

■ Landowners do not dispute this testimony but argue PSI failed to prove a proper need for the additional electricity it will be able to produce upon completion of the Gibson station as originally planned. We remind Landowners of our standard of review, *supra*, and conclude there is sufficient probative evidence to support the trial court's findings of necessity based on the desired goals of system reliability and stability. These goals were shown to be present immediate needs as well as fair and reasonable future needs, thus the taking of the easement is not unlawful under *Country Estates, Inc., supra*, and *Meyer, supra*, as Landowners contend. In *J. M. Foster Company, Inc. v. Northern Indiana Public Service Company, Inc.*, (1975) 164 Ind.App. 72, 326 N.E.2d 584, we specifically concluded that in appropriating property for the purpose of increasing reliability of its system, a utility does not exceed the authority delegated to it by the legislature.

Landowners also argue the easement is not being taken for a proper public purpose because the additional electricity to be generated and distributed upon the completion of the Gibson station was not shown to be needed by Indiana residents.

Ind.Code 32–11–3–1 states in part:

"Any corporation organized under the law of the state of Indiana, authorized by its articles of incorporation *to furnish, supply, transmit, transport or distribute electrical energy ... for the use of the public* or for the use of any town or city, is hereby authorized and empowered to take, acquire, condemn and appropriate land, real estate or any interest therein, for carrying out such purposes and objects together with all accommodations, rights and privileges deemed necessary to accomplish the use for which the property is taken ...." (Emphasis added.)

Thus, the legislature has expressly granted the power of eminent domain to PSI to furnish electricity to the "public" not to Indiana residents alone.

The Indiana Supreme Court long ago laid to rest the contention that a utility's power of eminent domain is affected by the fact that one of the proposed uses of land sought to be appropriated is to provide transmission lines for the transportation and sale across state lines to other utilities. In *Shedd v. Northern Indiana Public Service Company*, (1934) 206 Ind. 35, 46–7, 188 N.E. 322, the court said:

"[T]he fact that it may incidentally or in connection therewith likewise serve the interest of a neighboring state, and the people of such state, will not render it any the less a public use, or the service any less a public service, subject to the regulation and control of the state."

Under the evidence recited, *supra*, it is evident that the Gibson station provides electricity to Indiana residents and any interstate service is only incidental to or in connection therewith.

All this aside, the crux of the trial court's findings was the necessity for system reliability and stability and Landowners have not even attempted to argue this does not relate to the electricity needs of Indiana residents.

■ The evidence is sufficient to show the line is needed to serve a proper public purpose.

*Issue II.*

Landowners argue that the order in each case is contrary to law for the reason that the evidence conclusively shows that PSI abused its discretion in arbitrarily and capriciously selecting a route following the Indiana and Michigan Electric Company

easement (old I&M route) instead of one following the existing Indiana and Michigan Electric Company corridor (I&M corridor). They assert that PSI's observation and analysis of the alternative routes were inadequate, and its selection of the old I&M route was therefore clearly erroneous.

The statutory power to condemn is not of course a power without limitation. It cannot be invoked to condemn land out of all proportion to all necessities. *Chicago, Indianapolis and Louisville Railway Company v. Baugh*, (1911) 175 Ind. 419, 94 N.E. 571. As previously stated, Ind.Code 32–11–3–2 provides:

> "*The condemnor may take*, acquire, condemn and appropriate a fee simple estate, title and interest *in such quantity or amount of land as it deems necessary for its proper uses and purposes*, except that for rights-of-way, the condemnor shall take, acquire, condemn and appropriate an easement." (Emphasis added.)

Thus, a proposed taking may be challenged as arbitrary, capricious, illegal, or fraudulent as to the selection of the route. *Guerrettaz v. Public Service Company of Indiana, Inc.*, (1949) 227 Ind. 556, 87 N.E.2d 721.

In *State ex rel. Indiana Department of Conservation v. Barber*, (1964) 246 Ind. 30, 37–38, 200 N.E.2d 638, our Supreme Court considered what might constitute arbitrary or capricious actions or decision-making on the part of a condemnor, as follows:

> "To act 'capriciously' has been defined as to act without apparent motive, suddenly, impulsively, according to whim or fancy, and not guided by steady judgment, intent or purpose. See Webster's Third New International Dictionary, page 333. The word 'arbitrary' is defined in Black's Law Dictionary, Fourth Edition, page 134, as follows:
>
> 'Means in an "arbitrary" manner, as fixed or done capriciously or at pleasure; without adequate determining principle; not founded in the nature of things; nonrational; not done or acting according to reason or judgment; depending on the will alone; absolutely in power; capri-

ciously; tyrannical; despotic; .... Without fair, solid, and substantial cause; that is, without cause based upon the law.... not governed by any fixed rules or standard.' "

The testimony of PSI's witnesses, all of whom were specially qualified and possessed of considerable experience, indicated that the selection of the old I&M route was not arbitrary or capricious. Everett Baynes, PSI's electrical engineer in charge of the transmission design section, testified that in selecting the Gibson-Cayuga route he first consulted United States Geological Survey maps and a textbook entitled "Natural Areas of Indiana And Their Preservation." He tentatively decided to locate the new line alongside the existing I&M Breed-Dequine lines. However, while flying the route by helicopter, he discovered and photographed a number of obstructions within the corridor. Thus, he considered an alternate route, which, upon initial observation, seemed feasible. Baynes then inspected the corridor from the ground and verified the obstructions which had been previously sighted. At that time he discovered signs along the path of the alternative route indicating that I&M possessed an easement for further transmission lines. Baynes then flew the alternate route for a closer inspection and finally selected it for the new Gibson-Cayuga line. Thus, in conclusion, we must state that Landowners have not shown that PSI selected the route without fair, solid, and substantial cause, without apparent motive, or without guidance by steady judgment, intent, or purpose.

*Issue III.*

Landowners argue there is insufficient evidence to support the trial court's finding that PSI made a good faith offer to purchase prior to filing the action for condemnation.

As earlier stated, this court will not weigh conflicting evidence nor resolve questions concerning the credibility of witnesses, but will consider only that evidence most favorable to the prevailing party together with all reasonable inferences to be drawn

therefrom. *Indiana and Michigan Electric Company, supra.*

The evidence most favorable to the finding of a good faith offer to purchase by PSI is as follows:

### Oxendine Property

The Oxendines, who were represented by an attorney, were first contacted in March, 1976, by Joe Hall, an agent of PSI, relative to an old easement. Hall contacted them yet again in December, 1976, and September, 1977. Hall made his first offer to purchase on January 15, 1979, and contacted the Oxendines again on January 17, January 31, February 28, March 14, and April 10, all in 1979. On this last date a final offer to purchase was made. The first offer was $5,447, and the last offer was $8,447. The Oxendines said they would rather give PSI an easement across the back of their property than one across the place sought by PSI. They did not discuss price with Hall nor improvements on the property nor special damage features. PSI submitted a Uniform Land or Easement Acquisition Offer to the Oxendines who made no reply either in person or by counsel.

Prior to the final offer PSI employed an independent professional appraiser, a resident of Vigo County, to evaluate the easement and PSI's final offer was greater than his valuation. The final offer was calculated by John B. Smitherman, supervisor of land and land rights for PSI, who is a licensed real estate broker and experienced in the field. He considered certain outside data such as comparable land sales and certain Purdue University farm land information. The record does not disclose any counterdemand by the Oxendines nor does it disclose any evidence at the trial on the objections to value or damages other than that submitted by PSI.

The Oxendines claim that the evidence was insufficient to show a good faith offer to purchase because: 1) Smitherman was not qualified; 2) peculiar characteristics of the property were not considered, and PSI used a bare ground basis; 3) PSI used outdated Purdue University land management reports and did not consider inflationary factors; 4) PSI failed to take into account improvements affected, possible building sites, or an airstrip; 5) PSI failed to consider that the parcel over which the line was to go was part of a larger parcel affected by the line; and 6) the independent appraiser's report was inadequate.

### Higgenbotham Property

The Higgenbothams were likewise first contacted by PSI relative to an old easement. At those contacts, George Higgenbotham, son of the owners, told representatives of PSI that he wanted to work out the matter so that he could trade easement rights for electricity. The Higgenbothams were likewise always represented by counsel. A Uniform Land or Easement Acquisition Offer was mailed to the Higgenbothams on January 29, 1979, with a copy of the transmittal letter and a copy of the offer being mailed at the same time to Hansford Mann, their attorney. That communication was never answered. No counteroffer or demand was ever made.

Prior to the offer, PSI caused the proposed easement to be evaluated by the same independent appraiser as used for the Oxendine property. His valuation of $5,550 was used by Smitherman, together with other data as mentioned in the Oxendine case. The offer to the Higgenbothams was $5,550. Here, too, the record is silent as to any value, damage, or counteroffer except for the evidence adduced by PSI.

The Higgenbothams' complaint that the offer was not made in good faith is the same as in the Oxendines' complaint.

■ Ind.Code 32–11–1–1 requires that before proceeding to condemn, the condemning authority shall make a good faith effort to purchase the easement, and has the burden of proving that fact together with the inability of the parties to agree. *Dzur v. Northern Indiana Public Service Company,* (1972) 257 Ind. 674, 278 N.E.2d 563; *Dahl, supra.* The condemnor need not offer fair market value. *Wampler v. Trus-*

tees of *Indiana University*, (1961) 241 Ind. 449, 172 N.E.2d 67. The meaning of a good faith offer in *Chambers v. Public Service Company of Indiana, Inc.*, (1976) 265 Ind. 336, 341, 355 N.E.2d 781:

> "What constitutes a good faith offer must be determined in light of its own particular circumstances. If a reasonable offer is made in good faith and a reasonable effort is made to induce the owner to accept it, statutory requirements have been met. *Wampler v. Trustees of Indiana University, supra. An offer must be fair and reasonable*, not wholly inadequate. 27 Am.Jur.2d *Eminent Domain* § 388 at 258. *A perfunctory offer is not sufficient. Id.* at 257. *Certainly an offer must be based upon a reasonable value of the property* albeit not necessarily the fair market value of the land. See *Wampler v. Trustees of Indiana University, supra.* It has been held that *an offer based upon an independent appraisal of the subject land will be deemed sufficient. Murray v. City of Richmond*, (1971) 257 Ind. 548, 276 N.E.2d 519 . . . ." (Emphasis added.)

■ The failure of the landowner to reply to an offer is evidence of a failure to agree upon a purchase price. *Dahl, supra.* In *Wampler, supra*, the court said in 241 Ind. at 457, 172 N.E.2d 67:

> "In our judgment the statute here . . . does not contemplate any impossibility to purchase at any price, however large, but merely an unwillingness on the part of the owner to sell only at a price which in the petitioner's judgment is excessive. In such an event the attempt to agree need not be pursued further than to develop the fact that an agreement to purchase is not possible at any price which the condemnor is willing to pay."

A single offer has been held sufficient proof that the condemning authority negotiated in good faith. *Murray v. City of Richmond*, (1971) 257 Ind. 548, 276 N.E.2d 519; *Stone v. Public Service Company of Indiana, Inc.*, (1973) 157 Ind.App. 328, 300 N.E.2d 121. In *Murray*, 257 Ind. at 553, 276 N.E.2d 519, the court said:

> "We do not interpret the word 'negotiations' in the statute to mandate a series of encounters of offers and counter-offers in an attempt to arrive at a price. Where, as here, the condemning authority has employed professional appraisers and has based its firm offer to purchase on figures presented to it by its appraisers, we hold that such an offer to purchase meets the requirement to negotiate as set out in the statute."

Failure to consider certain factors affecting damages and value does not render the offer invalid as not being in good faith. *Wyatt-Rauch Farms, Inc. v. Public Service Company of Indiana, Inc.*, (1974) 160 Ind. App. 228, 311 N.E.2d 441.

■ Applying the above authorities to the facts in this case, the issue must be resolved in favor of PSI. PSI employed an independent appraiser and applied certain accepted techniques in arriving at an offer. Numerous contacts were made by PSI with the landowners. Any inadequacies in the offer are incapable of assessment by the trial court or by us because the landowners expressed no opinion of value nor made any demand, either at the negotiations stage or at the trial. We have nothing with which to compare PSI's offer. As stated in *Wyatt-Rauch Farms, Inc., supra*, this is not a review of a final judgment on damages.

The absence of good faith is bad faith. Bad faith is not simply bad judgment or negligence. Rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity. It is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will. *Stath v. Williams*, (1977) Ind.App., 367 N.E.2d 1120. An examination of the evidence, in our opinion, discloses that the offer by PSI was made in good faith. This is all that is required to satisfy the burden placed upon PSI by the statute.

*Issue IV.*

Landowners claim that the rule stated in *Wampler, supra*, which did not require the offer to be based on fair market value, was

changed by the legislature in 1977 by the enactment of Ind.Code 32–11–1–2.1 which provides that the condemnor shall make an offer in accordance with the Uniform Land or Easement Acquisition Offer as set out in subsection (d) of the statute. The statutory form contains the following sentence:

"It is our opinion that the fair market value of the (property) (easement) we want to acquire from you is $_____, and, therefore, _____ (condemnor) offers you $_____ . . . . "

Therefore, Landowners contend the rule in *Wampler, supra,* was changed by statute.

The Uniform Land or Easement Acquisition Offer contains only one blank for a money figure, that following the phrase "fair market value of the (property) (easement) we want to acquire." Ind.Code 32–11–1–6 contemplates the total payment to the landowner to include: 1) the fair market value of the property; 2) the fair market value of the improvements; 3) damages to the residue; 4) such other damages, if any, as will result from the construction of the improvement; and 5) benefits. The form does not specify any of those elements except fair market value of the land.

Further, Ind.Code 32–11–1–1—13 provide three stages for determining the total payment to the landowner: Ind.Code 32–11–1–1, 32–11–1–2, and 32–11–1–2.1 require first a good faith attempt to purchase; 2) Ind. Code 32–11–1–4 requires the appointment of three disinterested appraisers to appraise in accordance with Ind.Code 32–11–1–6; and 3) Ind.Code 32–11–1–8, after exceptions to the appraiser's report, allows a trial before a court or jury on damages and value.

It follows that if the legislature had intended the condemnor to offer an irrefutable fair market value figure which would include all the damages as a precondition to the taking, the second and third stages would be wholly unnecessary. Fair market value and damages are subjects on which reasonable people can and do widely disagree. Who is to say, at the inception, what fair market value is. We do not think the legislature intended the result argued by Landowners. It intended only that the con-

demnor make a good faith offer, as discussed elsewhere in this opinion, as a precondition to the taking.

In support of our conclusion we make the following observation. As in this case, where a landowner simply refuses to discuss sale with the condemnor, the condemnor must make a determination of value and damages from outside, often limited, sources, and, acting in the best of faith, may be unaware of certain specific elements that would enhance value or damages. We perceive this to be why the legislature inserted the second and third stages to permit the landowner, and the court, to explore the matter thoroughly for the protection of the landowner.

*Issue V.*

█ Landowners contend that the pre-condemnation offers were not made in good faith and were inadequate because PSI inserted into the form of the proposed easement, which it attached to the Uniform Land or Easement Acquisition Offer, the following language (other than record pages, identical in both easements):

"Grantor and Grantee acknowledge that there exists in Deed Record 314 page 84, in the office of the Recorder of Vigo County, Indiana, a Right-of-Way Easement over Grantor's 'Premises' which said Easement was assigned to Grantee herein, and said assignment is recorded in Release Record 14, Page 378 in the office of the Recorder of Vigo County, Indiana. It is understood and agreed that such former Right-of-Way Easement, subsequently assigned to Grantee herein, shall be deemed to merge into this Right-of-Way Easement and that all rights, obligations and responsibilities between the Grantor and leasees and licensees, shall be governed and controlled by this Right-of-Way Easement."

An explanation of this language indicates that Indiana and Michigan Electric Company acquired easements along the entire route of the transmission line in 1958, including easements from Landowners, which it later assigned to PSI. A dispute arose between PSI, the grantors of the ease-

ments, and Indiana and Michigan Electric Company concerning the validity of the easements, and PSI brought an action for declaratory judgment to determine rights in the dispute. Landowners, as defendants in that suit, countered with claims for fraud, abuse of process, or abuse of civil rights; subsequently, PSI dismissed the declaratory judgment action and began to acquire anew easements for its transmission line, by the eminent domain procedures or purchase.

Landowners contend that the insertion of the quoted language in the easement was an attempt by PSI to winkle Landowners' rights in that old litigation away from them under the guise of a precondemnation offer, and that by adding any written material to the statutory Uniform Land or Easement Acquisition Offer, the offer was rendered insufficient as a precondemnation good faith offer to purchase. We disagree.

First, their initial contention greatly strains the plain words of the inserted material. The obvious purpose of the language was to clear up title problems growing out of the previous easements. Second, we view PSI's offer as a forthright representation of the terms of the agreement to be perused by Landowners and their lawyers and accepted or rejected as it pleased them. The Uniform Land or Easement Acquisition Offer was submitted *in toto.* We hold that the submission of supporting material in addition to the Uniform Land or Easement Acquisition Offer does not render it inadequate.

*Issue VI.*

 The next contention of Landowners in that the court erred in quashing their subpoena duces tecum for PSI's construction budget and in refusing to permit Landowners to make inquiry into the amounts budgeted for each year. Landowners claim that the budgets would be material to the issue of what facilities PSI actually believed it needed and the dates when PSI believed they would be needed. Landowners acknowledge the holding in *Chambers, supra.* There the court held that a construction budget was not admissible and not discoverable. The issue in *Chambers* was

the contention by the landowner that the construction budget had relevancy in determining the question of a good faith offer. The court said, in 355 N.E.2d at 785, that the amount budgeted does not logically tend to prove what is the reasonable value of property, and that "budgetary constraints cannot be used to defeat condemnation. The lack of immediately available funds is not grounds for abating condemnation."

It is not clear how a construction budget would show what facilities PSI considered it needed nor when they were needed. At the time of trial the line was 99 percent complete, all but across Landowners' property. Evidence disclosed that it was scheduled to be in operation in late 1977. Landowners claim that the PSI employee who prepared the budget testified that the budget would reflect the date when PSI really thought the line was needed. Our reading of the testimony reveals to us that the budget reflected construction needs not energy needed for operation. We are of the opinion that the construction budget is irrelevant to the question of whether the proposed transmission line was needed for the proper operation of the utility.

*Issue VII.*

Landowners next argue that the trial court abused its discretion by denying their motion to introduce supplemental evidence which would have shown PSI's current demand forecast to have been grossly erroneous and its need for the line to be unproven. Landowners further argue that the evidence could not have been produced at the time of the hearing on objections as the evidence that would have been introduced as supplemental evidence was the peak usage of electricity for the winter of 1979–1980 which occurred after the hearing. Landowners contend that the evidence would have shown that the peak usage actually was 400 megawatts less than predicted by PSI's June, 1979 forecast which was in evidence. They contend that this evidence must be considered and it was an abuse of discretion on the part of the trial court not to do so. Trial was concluded

December 31, 1979, and the motion to introduce supplemental evidence was filed February 11, 1980.

 The refusal of a trial court to reopen a case for the presentation of additional evidence rests within its sound discretion. *Utopia Coach Corporation v. Weatherwax*, (1978) Ind.App., 379 N.E.2d 518. An abuse of discretion has been defined as an erroneous conclusion and judgment which is clearly against the logic and effect of all the facts and circumstances before the court. *Parks v. Koser*, (1955) 125 Ind.App. 585, 126 N.E.2d 785. It is not an abuse of discretion to refuse to reopen a case to hear further evidence where it is merely cumulative. *Pigg v. Cook*, (1952) 123 Ind.App. 414, 109 N.E.2d 107.

Here the evidence was offered long after the trial was over and during the briefing stage of the appeals process. The evidence is not so persuasive as to demand a different result. It was evidence of occurrences happening after the trial. The issue of need for the new line is the issue. Much evidence was presented on this subject and was considered *infra*.

This evidence of need was directed not only to the ability of PSI to meet peak demands but also to the stability of the whole system. Thus, to an extent, the evidence was cumulative. Under all the circumstances we cannot say that the court abused its discretion in refusing to reopen the case.

*Issue VIII.*

Landowners finally challenge the constitutionality of the eminent domain statutes. They assert that the acts violate Article 1, § 23, of the Indiana Constitution and the Fifth Amendment to the United States Constitution. Landowners acknowledge that they are "keenly aware" that the 1905 Eminent Domain Act has been held constitutional as applied. Nevertheless they invite us to take a fresh look at the manner in which governmental power of eminent domain, delegated by the act to corporations claiming public purposes, is actually being used and abused. We decline this invitation. To succumb to this ardent courtship would require us to denounce a long line of cases decided by the Supreme Court and this court. *Dahl, supra; Sisters of Providence of St. Mary's of The Woods v. Lower Vein Coal Co.*, (1926) 198 Ind. 645, 154 N.E. 659, overruled on other grounds, *Joint County Park Board of Ripley, Dearborn and Decatur Counties v. Stegemoller*, (1949) 228 Ind. 103, 88 N.E.2d 686, 89 N.E.2d 720; *Anthrop v. Tippecanoe School Corporation*, (1973) 156 Ind.App. 167, 295 N.E.2d 637. The question is legislative not constitutional. *Dahl, supra.*

For the reasons stated above, the decision of the trial court is affirmed. The stay of execution of the trial court's judgment ordering condemnation heretofore granted is now ordered dissolved.

We wish to compliment counsel on both sides on their excellent briefs.

Affirmed.

YOUNG, P. J. (participating by designation), and STATON, J. (participating by designation), concur.