James **WATSON** and Viva **Watson,**
Appellants (Defendants Below),

v.

Michael **THIBODEAU** and Karen **Thibodeau,** Appellees (Plaintiffs Below).

No. 29A04–8909–CV–411.

Court of Appeals of Indiana,
Fourth District.

Sept. 20, 1990.

Viva Watson, Cicero, pro se.

Matthew F. Purol, Greenfield, for appellees.

CONOVER, Judge.

Defendants–Appellants James and Viva Watson (Watsons), *pro se* appeal the Hamilton Circuit Court's judgment finding the location of their sailboat cradle in Morse Reservoir to be a nuisance, mandating them to change its location, and awarding Plaintiffs–Appellees Michael and Karen Thibodeau (Thibodeaus) $1,200 in damages.

We affirm in part and reverse in part.

The Watsons present several issues which we restate as follows:

1) whether the Watsons own riparian rights because their property line abuts the shore of Morse Reservoir;

2) whether the constitution and laws of Indiana operate to grant the Watsons the riparian rights specifically withheld from them by the terms under which they purchased their lot from their predecessor in title; and

3) whether the trial court's judgment is sustained by sufficient evidence.

As cross-error, the Thibodeaus assert the trial court erred by not assessing punitive damages in addition to the compensatory damages it awarded, and this is a frivolous appeal which entitles them to recover their appellate attorney fees.

Cicero Shores was developed by the Shorewood Corporation, subject to certain agreements and restrictions between it and Indianapolis Water Company, owner of the water and the land beneath the Reservoir and former owner of the real estate upon which Cicero Shores was developed. Under these agreements, covenants, and deed restrictions, owners of subdivision lots abutting the Reservoir have no riparian or littoral rights therein because all such rights were specifically reserved to Indianapolis Water Company in its deeds of conveyance to Shorewood. Shorewood's Architectural Committee controls the abutting owners' access to the Reservoir and the placing of docks, etc. therein as Indianapolis Water Company's representative.

The Watsons purchased a lot abutting Morse Reservoir in Cicero Shores subdivision in 1978. The Thibodeaus purchased a lot contiguous to the Watsons' in June of 1983, which also abutted the Reservoir.

When the Thibodeaus bought their lot, a boat dock floating in the Reservoir both anchored therein and tied to their seawall was included in the sale. Shortly after the Thibodeaus purchased their property, the Watsons placed a tubular sailboat lift cradle so close to the Thibodeaus' dock they were unable to use one side of it. Later, when the Thibodeaus moved their dock far enough away from the Watsons' sailboat cradle so they could use both sides, the Watsons immediately moved their sailboat cradle toward the relocated dock so as to again obstruct the Thibodeaus' use of one side of it.

Efforts to mediate this impasse over the years through Shorewood's Architectural Committee were to no avail. The Watsons steadfastly refused to move their sailboat cradle.

When the Thibodeaus filed suit for damages and an order of mandate, the Watsons appeared by counsel and filed answer and a counterclaim. After a trial on the counterclaim's merits, the trial court entered judgment against the Watsons for $1,200 damages for maintaining a nuisance and an order mandating them to move their sailboat cradle a minimum of four feet away from the Thibodeaus' dock to give them access to its blocked side. At that point, the Watsons' attorney withdrew his representation because he would be unable to pursue an appeal for them due to other commitments. The Watsons, *pro se* then filed a motion to correct errors and several extraneous exhibits that should have been offered at trial. When the trial court overruled their motion, the Watsons posted bond and the trial court granted a stay pending this appeal.

The Watsons appeal, *pro se.*[1]

■ The Watsons first argue they are owners of riparian and littoral rights in Morse Reservoir because their property abuts the shoreline, and they have a right to place their sailboat cradle in the water anywhere within the boundaries of their extended property lines. Having such rights, the trial court erred they contend because it did not decide the case on the basis of extending their property line straight out into the Reservoir, as required by *Bath v. Courts* (1984), Ind.App., 459 N.E.2d 72. Rather, they claim it erred by angling it into the Reservoir so as to make their dividing line in the water perpendicular to the shoreline but at an obtuse angle to the Watsons' property line.

When Indianapolis Water Company originally conveyed the land subsequently developed as Cicero Shores to Shorewood Corporation on December 30, 1960, the property's riparian and littoral rights to the Reservoir were specifically reserved to the water company. The substance of all these restrictions and reservations is set forth in the following covenant regarding Morse Reservoir:

*Article I*

. . . .

(1) Title in Shorewood to the Morse Reservoir Land shall extend only to the shore line of Morse Reservoir as said shore line would have been established on the date hereof if the water level were at an elevation of 810.0 feet above sea level.... Shorewood shall have no rights of any character with respect to Cicero and Hinkle Creeks, the reservoir, the land thereunder, the water therein, ... and the Morse Reservoir Land shall have no riparian or littoral rights or incidents appurtenant,....

(R. 405).

■ A riparian owner acquires his rights to the water from his fee title to the shoreland. *Bath*, 459 N.E.2d at 74; *Brown v. Heidersbach* (1977), 172 Ind.App. 434, 360 N.E.2d 614, 619. While riparian rights may be transferred by grant and are generally transferred without special mention in the conveyance, they may be specially reserved to the grantor. Riparian rights may be separated from the ownership of the land to which they are appurtenant, either by grant of such rights to another, or by a reservation thereof in the conveyance of the land, as did Indianapolis Water Company here. *Williams v. Skyline Development Corp.* (1972), 265 Md. 130, 288 A.2d 333, 349; *Gilbert v. Eldridge* (1891), 47 Minn. 210, 49 N.W. 679, 681; 78 Am.Jur.2d *Waters* § 277; 2 Tiffany, *The Law of Real Property,* § 667, pp. 723–724. Thus, none of the parties to this action had riparian or littoral rights to Morse Reservoir because no such rights were conveyed to their predecessor in title Shorewood Corporation.

---

1. While the Watsons' briefs and the record they prepared do not comply with the requirements of the appellate rules in several respects, they are sufficient after much study to present the issues and argument on the points raised. The inordinate expenditure of judicial time in deciphering these briefs is discussed and acted upon in the latter portions of this opinion. With the help of appellees' statement of the facts, we are able to review this case on the merits.

The holding in *Bath* is premised upon the ownership of riparian rights. The Watsons own none because Shorewood Corporation had none to convey. The Watsons constructively and personally knew that fact because Viva Watson had read and was familiar with these restrictions. She so testified at trial. (R. 656–657). The trial court did not err in determining the Watsons had no riparian or littoral rights in Morse Reservoir.

The Watsons' next contention they have riparian rights in the reservoir through the constitution and laws of this state also is without merit. Their references to Indiana Administrative Code Sections 310 IAC 2–29–1 and 2–2 dealing with speed boat operations and the placing of buoys to mark swimming areas and other zones give them no such rights. IC 14–1–1–1 defines terms used in that chapter, but does not grant the Watsons any rights. IC 14–1–1–30 authorizes the adoption of speed regulations and special use areas on lakes and streams. We note further Section 30's proviso prohibiting rules which prohibit or deprive "owners of land adjoining or abutting upon said lakes ... access, ingress, and egress to said land by means of motorized watercraft" has been meticulously honored by Indianapolis Water Company. It has provided for access by that class of persons by arranging for the reasonable placement of docks and other devices on the Reservoir through its agent for such purposes, Shorewood Corporation and its Architectural Committee, even though property owners in Cicero Shores own no riparian or littoral rights in or to the Reservoir.

IC 13–2–4–5 also is of no comfort to the Watsons. Its provision requiring riparian owners to build and maintain docks, etc. "within their premises" applies only to those owners who in fact own riparian rights. The Watsons do not. The remainder of the Watsons' statutory citations have no application here because the Watsons own no riparian rights, as they well know. We find no error here.

Finally, it is readily apparent the evidence is sufficient to support the trial court's judgment. Cicero Shores' develop-

er Shorewood Corporation has never owned riparian rights to Morse Reservoir and thus, could convey none. Without owning such rights, the Watsons have no standing to complain of the trial court's action. The power of a court to issue a mandatory injunction as a means of enforcing restrictive covenants is well established. *Highland v. Williams* (1975), 166 Ind.App. 492, 336 N.E.2d 846, 847. We also find no error in this regard.

The matter does not end here, however. As cross-error, the Thibodeaus argue the trial court erred in failing to award them punitive damages and attorney fees. They claim the evidence below was clear and convincing the Watsons were guilty of "intentional, callous, and malicious invasion of Thibodeaus' rights." (Appellees' Brief, p. 30). They assert the Watsons maintained the nuisance for five years and the fair rental value of their property was diminished by $250.00 per month. Thus, they claim, damages should have been assessed at $15,000 rather than the $1,200 awarded by the trial court. Next they posit, they were forced to defend a baseless, frivolous and unreasonable counterclaim and currently are required to defend this appeal which also is frivolous and brought only for purposes of vexation and delay.

[5] We first address the punitive damages issue. We note at the outset, the Thibodeaus' argument actually requests compensatory not punitive damages. The purpose of compensatory damages is to award or impose a pecuniary compensation, recompense or satisfaction for an injury done or a wrong sustained by a party. *Indiana University v. Indiana Bonding and Surety* (1981), Ind.App., 416 N.E.2d 1275, 1288. In contrast, punitive damages are not compensatory in nature but are assigned to punish the wrongdoer and deter similar conduct in the future. *Orkin Exterminating Co., Inc. v. Traina* (1986), Ind., 486 N.E.2d 1019, 1022. Here, the Thibodeaus are asking to be compensated for a monetary injury committed by the Watsons, thus in their argument they are actually requesting compensatory not punitive damages.

■ Even so, we will address the issue of whether the trial court erred by denying the Thibodeaus punitive damages. We find the trial court did not err in this regard.

■ Punitive damages must be supported by clear and convincing evidence. *Peru Daily Tribune v. Shuler* (1989), Ind. App., 544 N.E.2d 560, 562 (*citing Traveler's Indem. Co. v. Armstrong* (1982), Ind., 442 N.E.2d 349, 363). The evidence must overcome the presumption the defendant's conduct was merely negligent or the result of some honest error. *A.B.C. Home & Real Estate Inspection, Inc. v. Plummer* (1986), Ind.App., 500 N.E.2d 1257, 1263, *reh. denied.* Punitive damages are recoverable only upon evidence the defendant acted with malice, fraud, gross negligence, or oppression which did not result from mistake of law or fact, honest error of judgment, over-zealousness, mere negligence or other human failing. *Bud Wolf Chevrolet, Inc. v. Robertson* (1988), Ind., 519 N.E.2d 135, 137. The defendant is cloaked with the rebuttable presumption his actions, though perhaps tortious, were nevertheless noniniquitous human failings. *Peru Daily Tribune, supra.* When there is a question as to the sufficiency of the evidence supporting the award or denial of punitive damages, we do not reweigh the evidence or judge the credibility of the witnesses. Rather, we consider whether a reasonable trier of fact, considering only the probative evidence and reasonable inferences drawn therefrom which support the judgment, could find such damages proven by clear and convincing evidence. *Cf. Bud Wolf Chevrolet, supra,* at 137. The sole issue is whether the defendant's conduct was so obdurate he should be punished for the benefit of the general public. *Orkin Exterminating, supra,* at 1022.

We do not believe the trial court erred by determining the evidence was not clear and convincing punitive damages should have been assessed against the Watsons to punish them for wrongdoing. Their reliance on the holding in *Bath,* although misplaced, may have signaled to the trial court the Watsons' seemingly oppressive behavior over the years was due to an honest mistake as to the applicable law and an honest error of judgment, a "noniniquitous human failing" in the trial court's view of the evidence. *Peru Daily Tribune, supra.* It deemed the Watsons' conduct not so obdurate as to require punishment for the benefit of the general public. *Orkin Exterminating, supra.*

The award of attorney fees at the trial level and at this one for being forced to defend a baseless counterclaim and a frivolous appeal brought for the purpose of vexation and delay is a much closer question, however.

■ In Indiana, the general rule requires each party to the litigation to pay his own attorney fees. Thus, attorney fees are not allowable in the absence of a statute or some agreement or stipulation authorizing such an award. *Kikkert v. Krumm* (1985), Ind., 474 N.E.2d 503, 504–505. Such a statute currently exists in this state.

In 1986, our legislature amended IND. CODE 34–1–32–1 to allow for the award of attorney fees and costs under certain circumstances. That statute provides:

Sec. 1. (a) In all civil actions, the party recovering judgment shall recover costs, except in those cases in which a different provision is made by law.

(b) In any civil action, the court may award attorney's fees as part of the costs to the prevailing party, if it finds that either party:

(1) brought the action or defense on a claim or defense that is frivolous, unreasonable, or groundless;

(2) continued to litigate the action or defense after the party's claim or defense clearly became frivolous, unreasonable, or groundless; or

(3) litigated the action in bad faith.

Thus, upon a finding of any of these elements, a court may award attorney's fees as part of the cost to the prevailing party. *In Re Marriage of Duke* (1990), Ind.App., 552 N.E.2d 504, 506.

■ We do not believe attorney fees at either level can be assessed against the Watsons under IC 34–1–32–1(b)(1) or (b)(2)

because no Indiana precedent holding riparian and littoral rights may be conveyed to third parties or reserved to the grantor existed in this state at the time the Watsons' counterclaim was filed below, as this case of first impression determines. Although rudimentary legal reasoning would have led a reasonable person to believe the Indiana courts probably would so hold when presented with that issue, no case in this state so held at the time the Watsons filed their counterclaim. Attorney fees under subsection (b)(3) for litigating in bad faith should have been awarded the Thibodeaus, however.

The question of whether the Watsons have litigated in bad faith requires a three-pronged inquiry in this case, namely, (a) whether there is bad faith present in an IC 34–1–32–1(b)(3) "substantive" sense, (b) whether there is bad faith present in a "procedural" sense, and (c) whether both substantive and procedural bad faith are present here.

 Even though the Watsons have prosecuted their appeal *pro se*, that is, on their own without being represented by counsel, they must comply with all the rules of appellate procedure just the same as a qualified attorney is required to do. *Bedree v. Larson* (1979), 181 Ind.App. 270, 391 N.E.2d 670, 671. Thus, when reviewing the question of whether attorney fees should be imposed as a sanction for failure to follow the rules of appellate procedure, we can cut the Watsons no slack simply because they have no formal legal training.

In defining what we here call "substantive" bad faith, Judge Neal cogently observed:

> [T]he absence of good faith is bad faith, but bad faith is not simply bad judgment or negligence. Rather, it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity. It is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will. *Oxendine v. Public Service Co. of Indiana, Inc.* (1980), Ind. App., 423 N.E.2d 612; *Stath v. Williams*

(1977), 174 Ind.App. 369, 367 N.E.2d 1120.

*Young v. Williamson* (1986), Ind.App., 497 N.E.2d 612, 617.

 Procedural bad faith on appeal is present when a party flagrantly disregards the form and content requirements of the Rules of Appellate Procedure, omits and misstates relevant facts appearing in the record, and files briefs appearing to have been written in a manner calculated to require the maximum expenditure of time both by the opposing party and the reviewing court. *Posey v. Lafayette Bank & Trust Co.* (1987), Ind., 512 N.E.2d 155, 156; *Briggs v. Clinton County Bank & Trust Co.* (1983), Ind.App., 452 N.E.2d 989, 1010. However, conduct can constitute procedural as opposed to substantive bad faith even though the objectionable conduct falls short of being "deliberate or by design." It depends upon the circumstances of the given case. *Hepp v. Pierce* (1984), Ind.App., 460 N.E.2d 186, 188. In *Hepp*, Judge Garrard discussing the applicable standard of review in bad faith cases, said:

> [S]ince [the question of whether bad faith is present] depends upon the circumstances, the prohibition against an appellate court reweighing the evidence comes to bear. Our review is dependent upon the facts and reasonable inferences before the court which support its determination.

*Id.*, at 460 N.E.2d at 188. We would add the party requesting the assessment of attorney fees against his adversary has the burden of proof thereon at trial. On appeal, the losing party on that issue appeals a negative judgment. We will reverse a negative judgment only if the evidence viewed most favorably to the trial court leads incontrovertably to a conclusion contrary to the one reached below. *Matter of Estate of Edington* (1986), Ind.App., 489 N.E.2d 612.

With this standard in mind, we turn to the substantive bad faith question. Our review of the facts contained in the record here reveals prior to the time the Thibodeaus purchased their property, the dock which came with it had been in position for

many months, apparently without objection from the Watsons. (R. IV 509). In July or August, 1983, less than two months after the Thibodeaus' purchased their property, the Watsons installed the sailboat cradle in a position less than three feet from the Thibodeaus' dock. Witness Nitterhouse, one of the Thibodeaus' neighbors, was present during that installation in July or August of 1983. He testified:

Q. And what was the nature of that?

A. Well, we were . . .)a little astounded at the proximity of the boat lift to the existing boat dock of Mike and Karen's.

Q. Astounded.

A. That it would be put so close that there was somewhere in the neighborhood of three feet . . .

Q. Okay. So what did you do in response to being astounded at this proximity?

A. Well, we had as I say a very brief conversation pointing out the fact primarily that this dock, this lift was going in so close that it would deny access to the east side of the boat dock.

Q. Did you tell Mrs. Watson that?

A. If I remember correctly . . ., . . . I believe the people who were doing the actual installation were in the water installing the lift and I believe Mrs. Watson was in front of her home up the hill.

Q. And what was the reaction?

A. My best description of it was a response was what I would call a smirk. No verbal response. Just kind of a smirk, smile, whatever you want to call it.

Q. From Mrs. Watson?

A. From both Mrs. Watson and the gentleman who was installing the lift.

(R. IV 508-510).

Michael Thibodeau also talked to Mrs. Watson about the sailboat lift's placement. He testified:

Q. Did you talk with Watsons or which one or who or . . .

A. I have always talked with Mrs. Watson. I do not believe I have ever had any conversation with Mr. Watson.

Q. Well, did you express to her that you were upset about where she was placing her dock?

A. Yes, I did.

Q. Okay. And what did she say?

A. "Too bad."

(R. IV 566).

To resolve this situation, the Thibodeaus later agreed to move their dock away from the sailboat lift when asked to do so by Mr. Culp, Shorewood's representative from the Architectural Committee, on the condition it write the Watsons a letter "stating that the angle of the sailboat lift not be changed," and Culp agreed. (R. IV 568). The Thibodeaus then moved their dock just past the center of their property on the shoreline to allow themselves as much room as they could on the formerly blocked side of their dock. That move satisfied the problem. (R. IV 572). The very next day, however, the sailboat dock was moved close to the Thibodeaus' repositioned dock. On this subject, Michael Thibodeau testified:

Q. And did that get you upset?

A. Yes, it did.

Q. Okay. So did you have more conversations with Watsons concerning this?

A. I just asked her why she had done it and then got a smirk and I believe that I had called her a few names.

(R. IV 572). The Watsons' second move again left the Thibodeaus' dock almost totally blocked on the east side. They then filed suit for damages and a mandate order against the Watsons.

The Thibodeaus put their property up for sale in May, 1986, sold it, and moved away. They did not push the case to trial believing it would be dismissed for lack of prosecution, as their attorney had explained to them. The Watsons, however, requested the case be set for trial on their counterclaim on June 15, 1988, two years after the Thibodeaus had moved away. (R. IV 613).

Finally, it is obvious the Watsons were and are angry about more than the mere positioning of boat docks and sailboat cradles in Morse Reservoir. Their appellants' brief dwells at length on such things as the

Thibodeaus building a "spite" fence next to the Watsons' house, their building of a dog kennel and a "dog" fence, and their failure to "produce" approvals for either fence (Appellants' Brief 29), matters having absolutely nothing to do with the theories under which the Watsons purport to have prosecuted their counterclaim to judgment and which they here advance for our consideration. We believe it is clear from the record and the tenor of their briefing in this court, the Watsons have doggedly pursued the prosecution of their counterclaim against the Thibodeaus with malice and in substantive bad faith as above-defined for purposes of vexation and delay, the penalty for which is dealt with later in this opinion.[2]

Further, there is procedural bad faith present here. The record's margin notes contain a plethora of arguments, witness by witness, attempts to insert additional evidence, and references to other parts of the record the Watsons evidently believe rebut the testimony appearing in the substance of the record, a clear and intentional violation of App.Rule 7.2(A)(3)(a). Next, the Watsons' statement of the facts is nothing more than a rote recitation of what the Watsons deem to be favorable testimony below, witness by witness, liberally interspersed with argument, not a narrative statement of the facts upon which judgment below was entered. This also is a clear violation of App.Rule 8.3(A)(5). Next, their brief's argument sections violate App. Rule 8.3(A)(7) in that (a) the claimed errors

are not set out specifically and followed by the argument applicable thereto, and (b) there is no clear showing of how the issues and contentions in support thereof relate to the particular facts of this case. Finally, it appears the Watsons' briefs "have been written in a manner calculated to require the maximum expenditure of time both by [appellee] and by this Court," more indication of procedural bad faith. *Posey v. Lafayette Bank and Trust Co.* (1987), Ind., 512 N.E.2d 155, 156. As Justice Dickson noted for a unanimous court:

> These are circumstances significantly more grave than mere lack of merit. Gross abuse of the right to appellate review 'crowds our court to the detriment of meritorious actions, and should not go unrebuked.' *Marshall v. Reeves* (1974), 262 Ind. 403, 404, 316 N.E.2d 828, 830 (quoting *Vandalia Railroad Co. v. Walsh* (1909), 44 Ind.App. 297, 299, 89 N.E. 320).

*Posey*, 512 N.E.2d at 156.

■ In sum, the trial court erred by not awarding the Thibodeaus' their attorney fees for defending the case pursued in substantive bad faith below.[3]

■ The Watsons' substantive bad faith warrants the assessment of the Thibodeaus' attorney fees against them for requiring the Thibodeaus to defend against the Watsons' counterclaim in the trial court and this appeal under IC 34–1–32–1(b)(3). Further, the additional imposition of a fine against the Watsons is warranted for filing

2. The Watsons' substantive bad faith is neither specifically or by implication attributable to their trial counsel, Mr. Berry. On the contrary, the Watsons were entitled to their "day in court" on their *Bath*-related theory, however tenuous. After fully advising his clients on the law as it then applied to their cause, counsel not only had the right but the duty to see the Watsons got their day in court as long as they insisted upon it and the attorney-client relationship existed between himself and the Watsons. Substantive bad faith deals with the client's motivation for the bringing or continuing of a lawsuit. The attorney's obligation in this regard is covered by our *Rules of Professional Conduct* § 3.1 and § 3.2. We further note in passing, Mr. Berry terminated the attorney-client relationship after the trial court entered judgment below.

3. The trial court's determination punitive damages were not warranted does not exclude the

imposition of attorney fees as costs against the Watsons. Punitive damages are assessed to punish the wrongdoer and to prevent similar conduct in the future for the public benefit. Substantive bad faith as the term is used in this opinion deals with a party's motivation for pursuing an action or counterclaim and concerns itself with penalizing those who attempt to use the judicial system for malevolent, vexatious, or vindictive purposes. The mere existence of a possibly viable legal theory is not in and of itself protection against the assessment of penalties such as the imposition of attorney fees where such theory is pursued primarily for malevolent or vexatious purposes. The judicial system was created and exists for the purpose of correcting wrongs. It may not be used as a tool for perpetrating them.

appellate briefs requiring the maximum expenditure of judicial time by this court in reviewing this cause on appeal.

Accordingly,

(a) the costs of this appeal are assessed against the Watsons;

(b) the Thibodeaus shall recover as part of the costs reasonable attorney fees for defending this appeal;

(c) the Thibodeaus shall also recover reasonable attorney fees for having to defend against the Watsons' counterclaim in the trial court; and

(d) the Watsons are fined in the sum of $2,000 for their willful failure to follow the appellate rules and for filing briefs requiring the expenditure of inordinate amounts of judicial time in the processing of this appeal under App.Rule 15(G).

The trial court, after hearing, shall determine and settle the amount of attorney fees to be recovered by the Thibodeaus for defending at trial and in this appeal, and shall report its findings thereon to this court within 30 days from the date of this opinion. The $2,000 fine above-imposed shall be payable into the clerk's office of this court along with the other costs in this appeal 10 days after this opinion becomes final. The attorney fees for defending at trial shall be paid into the trial court clerk's office. Fees for defending on appeal and the fine assessed shall be paid into our clerk's office as part of the costs of this appeal.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

MILLER, P.J., concurs.

HOFFMAN, P.J., dissents with separate opinion.

HOFFMAN, Presiding Judge, dissenting.

I respectfully dissent to the assessment of attorney fees and a fine against appellants. As the majority notes, this is a case of first impression. The appellants' desire to have their case reviewed by an appellate court on an issue of which there is no Indiana precedent cannot be deemed litigating in bad faith. There is no evidence that appellants in pursuing their novel claim were affirmatively operating with furtive design or ill will. *Young, supra.* Furthermore, as the majority also notes, the appellants' pro se brief adequately presented the issues and argument. This is sufficient to preclude a finding of procedural bad faith.

As to the imposition of a fine pursuant to Ind.Appellate Rule 15(G), this rule provides:

"(G) Damages Against Appellant. If the court on appeal affirms the judgment, damages may be assessed *in favor of the appellee not exceeding ten per cent (10%) upon the judgment, in money judgments,* and in other cases in the discretion of the court; and the court shall remand such cause for execution. [Emphasis added.]"

Clearly the majority was acting without authority in assessing a $2,000.00 fine against appellants payable to the clerk's office.

I would affirm the trial court.