ORKIN EXTERMINATING CO., INC.
Appellant, (Defendant Below),

v.

Charles TRAINA and Michelle Traina,
Appellee, (Plaintiff Below),

No. 29S04–8601–CV–2.

Supreme Court of Indiana.

Jan. 2, 1986.

John P. Price, Jon D. Krahulik, Robin L. Babbitt, Bingham Summers Welsh & Spilman, Indianapolis, for appellant.

Albert George, Duvall, Bell, Babcock & Payne, Robert W. York, Wilson & Kehoe, Indianapolis, Michael A. Howard, Smith Pearce & Howard, Noblesville, for appellee.

PRENTICE, Justice.

This case is before us upon the petition of Defendant (Appellant) to transfer the cause from the Court of Appeals, Fourth District, that court having affirmed the award of punitive damages by the trial court by decision and opinion published at 461 N.E.2d 693. Said decision contravenes ruling precedents of this Court and conflicts with prior decisions of the Court of Appeals, to-wit: *Travelers Indemnity Co. v. Armstrong* (1982), Ind., 442 N.E.2d 349; *Liston v. State* (1969), 252 Ind. 502, 250 N.E.2d 739; *Miller Pipeline Corp. v. Broeker* (1984), Ind.App., 460 N.E.2d 177, *reh. denied* 464 N.E.2d 12 in that such award is not sustained by the evidence and is, therefore, contrary to law.

The evidence, insofar as it is relevant to the issue and viewed in the light most favorable to the verdict, discloses that the Defendant was in the pest control business and that the Plaintiff (Appellee) had availed himself of its services to exterminate insects in his residence. It was Defendant's practice to send its technicians, of which Coleman was one, unsupervised into the customer's buildings, including private residences, and to spray chemical solutions.

Defendant's branch office, out of which Coleman worked, was managed by Karl Koch, and Steven Hinkley was the office manager trainee, having worked in that capacity for only three months. Among other duties, Hinkley was responsible for hiring and supervising the technicians and had investigated, interviewed and hired Coleman. Koch was responsible for training Hinkley, whose prior experience in hiring and supervising personnel had been minimal, and acknowledged that his supervision of Hinkley's hiring of Coleman had been limited to counseling him with regard to the Defendant's goals regarding its public image and its employee's attitudes.

Defendant had an elaborate procedure provided in its manuals for the selection of technicians, which procedures were not adhered to by Hinkley in his selection and employment of Coleman. (Neither was Coleman subjected to a six-week training program prescribed by company policy but was sent into residences, alone, to service them after having been accompanied by Hinkley to several residences on but one occasion.) The omissions of Defendant particularly cited by Plaintiff as evidencing culpability in hiring Coleman are its failure to obtain a comprehensive five-year employment background record and hiring him without first obtaining the results of a polygraph test that had been given to him. However, as observed by the Court of Appeals, " * * * an exhaustive background check would have revealed an unremarkable employment history in Coleman's case, that is, no fact which would have put Orkin on notice" that an injury, such as is here involved, was likely to occur as a result of Orkin's proposed employment of Coleman.

Had Defendant's manual of procedure been followed, Hinkley may have learned that his statements as to his prior employment were incomplete and in some respects misleading, and the following stated adverse matters probably would have been revealed; Coleman had been suspended for ten days from his previous job as a security guard for being absent without permission, lying about his whereabouts and being derelict in his duties. He had been discharged from a job three years earlier for absenteeism and for being a "poor worker." He had previously given conflicting answers on job application forms, stating in some that he was in good health and in others that he had left prior employment for "health reasons."

It was Defendant's policy to put technicians into homes, without supervision, only after the second week of the six-week training program. During the third and through the sixth week, they could go without supervision, except for two hours daily, after which time they were regarded as being fully qualified to perform their work unsupervised. This policy was not adhered to in Coleman's case. Rather, he was subjected to "on the job training for at least several days," supplied with some orientation materials and viewed some training films. Except for one day, Coleman's on-the-job training was provided by two other technicians; and Hinkley, whose responsibility it was to train Coleman went with him on but one day to service the homes of several customers.

Notwithstanding the aforementioned policy, Coleman began performing his work, unsupervised, on September 5, 1979, the fourth day of his employment. The course of Coleman's employment was uneventful until September 15th, when Hinkley discovered him working on an improvised device which he called a pen-gun, which was the barrel and firing mechanism from a tear gas gun which Coleman had modified to fire a .25 caliber cartridge with the powder charge reduced by about fifty percent. Coleman acknowledged that he was aware of the company policy against workmen carrying firearms but said that he carried it to protect himself against large dogs, one of which had chased him to the top of his truck. Coleman had previously told Hinkley of his fear of dogs and Hinkley had instructed him a few days earlier how to cope with them. Hinkley was very stern in his reprimand of Coleman. He reminded him of the anti-gun policy and told him to get rid of the device and that he would be fired if he did not. Coleman said that he understood the reason for such policy and agreed with it and assured Hinkley that he would not carry it anymore. Hinkley accepted Coleman's assurance, said nothing more about the matter and did not notify his supervisor, Koch.

On September 22nd, notwithstanding the reprimand and warning from Hinkley, Coleman carried the gun in his shirt pocket when he went to the residence of Charles and Michelle Traina. While Plaintiff and Coleman were in the basement, it fell from his pocket, by accident, and discharged. The projectile struck Charles in the right forearm and caused a severe injury, for which he was awarded $65,000.00 in damages and Michelle was awarded $2,000.00 for loss of consortium. Defendant was liable for these damages under the doctrine of respondeat superior, and there has been no appeal upon that issue. The judgment also included an award of punitive damages in the sum of $400,000.00. Defendant's motions in trial and post trial clearly challenged the sufficiency of the evidence to sustain the punitive damages award and were erroneously overruled.

The Court of Appeals was correct in determining that the *Armstrong* clear and convincing evidence rule applies in pure tort cases as well as in those rare breach of contract cases where it is clear that the breach contained "elements that enable the court to regard them as falling within the field of tort or as closely analogous thereto," 5 Corbin, *Contracts* § 1077 (1964), *quoted in Vernon Fire and Casualty Insurance Co. v. Sharp* (1976), 264 Ind. 599, 349 N.E.2d 173, although such a resolution may not be necessary to our determination of this case, as it is doubtful that the award

of punitive damages under the facts before us could be affirmed under any standard.

Whatever standard of proof is required at the trial level, if it can be said that either of two conclusions can be reasonably drawn from the evidence, it is immaterial, upon appeal, that one of such conclusions appears to be more likely than the other, and we are bound by the finding of the trier of fact. However, when, as here, the conclusion reached by the fact finder simply cannot be reasonably arrived at under the evidence, that is to say that no reasonable person could draw such conclusion from the evidence, then the judgment resting thereon is contrary to law and cannot stand. *Loyd v. State* (1980), 272 Ind. 404, 407, 398 N.E.2d 1260, 1264 *cert. denied* 449 U.S. 881, 101 S.Ct. 231, 66 L.Ed.2d 105 (conflicting evidence); *Osbon v. State* (1937), 213 Ind. 413, 13 N.E.2d 223 (no evidence); *Citizens Street Railroad Co. v. Reed* (1898), 151 Ind. 396, 51 N.E. 477 (conflicting evidence).

 Punitive damages are not compensatory in nature but are designed to punish the wrongdoer and to dissuade him and others from similar conduct in the future. *Indianapolis Bleaching Co. v. McMillan* (1916), 64 Ind.App. 268, 113 N.E. 1019. They are awarded in addition to the awards for financial loss, pain and suffering and other such considerations. Hence, when the question of whether or not punitive damages should be given is considered, it must be done with the realization that the plaintiff has already been awarded all that he is entitled to receive as a matter of law. What, if anything, he may be given in addition is a windfall, and in making that decision all thoughts of benefiting the injured party should be laid aside and the sole issues are whether or not the Defendant's conduct was so obdurate that he should be punished for the benefit of the general public. Punitive damages may be likened to a fine imposed for breach of the criminal statutes. Although the State receives the fine and thus benefits, the purpose is not to raise revenue.

 It is because the concept of punitive damages is penal in character that a standard of proof akin to that required in criminal trials is utilized, rather than the preponderance of the evidence standard employed in trials of civil actions. *Travelers Indemnity Co. v. Armstrong* (1982), Ind., 442 N.E.2d 349.

In a criminal action, the defendant is *presumed* to be innocent, and it is the burden of the State to prove his guilt *beyond a reasonable doubt,* the highest required degree of proof recognized in our system of jurisprudence. In the trial of a civil action for compensatory damages, there is no presumption of virtue favoring either the plaintiff or the defendant. They start evenly balanced on the scales of justice.

The distinction between the burdens of proof in criminal and civil cases has been explained as follows:

"The rule thus stated by two instructions is admittedly the rule in criminal cases, where the degree of proof necessary is 'beyond reasonable doubt' and where the accused is protected by 'a presumption of innocence until proven guilty.'

This appeal involves a civil case, however, where the burden was merely to prove the material allegations of the complaint by a 'fair preponderance of the evidence,' and *where there was no presumption of freedom from fault or freedom from liability upon the part of the appellant."* (Emphasis added.)

*Kempf v. Himsel* (1951), 121 Ind.App. 488, 516, 98 N.E.2d 200, 212 (*transfer denied*).

In *Travelers Indemnity Co. v. Armstrong, supra,* we established the "clear and convincing evidence" standard for application in the trial of punitive damages claims, a standard which is but minutely below the "reasonable doubt" standard, because such actions are more akin to criminal actions than to civil suits, there being a presumption that the defendant's conduct that gave rise to the underlying claim and entitlement to compensatory damages was not inflicted with the obduracy relied upon

by the plaintiff to sustain his claim that the defendant, *in the public interest*, should be penalized.

■ Just as the defendant in a criminal action is cloaked with a presumption of innocence, the defendant, in a claim for punitive damages, is cloaked with the presumption that his actions, though tortious, were nevertheless noniniquitous human failings, i.e. that he is *not guilty of the quasi-crime alleged*. Were it otherwise, there would be no restraint upon the award of punitive damages upon conflicting inferences. The rule is nothing more than the rule applicable in criminal trials resting entirely upon circumstantial evidence, i.e. the evidence must exclude every reasonable hypothesis of innocence. *Robinson v. State* (1919), 188 Ind. 467, 124 N.E. 489, *cited with approval in Spears v. State* (1980), 272 Ind. 634, 401 N.E.2d 331. Such evidentiary requirement, at the trial level, is a further basis for our rule from *Travelers Indemnity Co. v. Armstrong, supra,* 442 N.E.2d at 362:

> "To avoid such occurrences, punitive damages should not be allowable upon evidence that is merely consistent with the hypothesis of malice, fraud, gross negligence or oppressiveness. Rather some evidence should be required that is inconsistent with the hypothesis that the tortious conduct was the result of a mistake of law or fact, honest error of judgment, over-zealousness, mere negligence or other such noniniquitous human failing. For, just as we agree that it is better to acquit a person guilty of crime than to convict an innocent one, we cannot deny that, given that the injured party has been fully compensated, it is better to exonerate a wrongdoer from punitive damages, even though his wrong be gross or wicked, than to award them at the expense of one whose error was one that society can tolerate and who has already compensated the victim of his error."

The presumption may, of course be overcome by circumstantial as well as by direct evidence, as in other cases. As the ultimate determination will invariably be controlled by the malfeasor's state of mind, however, direct proof will rarely be available, and the evidence will usually have to be gauged by the circumstantial evidence standard.

■ Plaintiff's theory upon the punitive damage issue is that the defendant, acting through Hinkley, was guilty of willful and wanton misconduct in sending Coleman into his home with knowledge that he had, on a prior occasion, carried the pen gun to protect himself from dogs and that he had not overcome his fear of them. He buttresses his argument with the undisputed evidence of Defendant's laxity in not following all of its own policies in the initial hiring and training of Coleman. We concede that punitive damages may be awarded upon a showing of willful and wanton misconduct, and we have no problem with Plaintiff's conception of willfulness and wantonness as not embodying malice, ill will or intent to injure. Rather, the perverseness that public policy will permit the courts to punish is conscious and intentional misconduct which, under the existing conditions, the actor knows will probably result in injury. *Mazza v. Kelly* (1970), 147 Ind.App. 33, 258 N.E.2d 171; a "conscious indifference," *Hoesel v. Cain* (1944), 222 Ind. 330, 53 N.E.2d 165 (*rehearing denied*); "heedless indifference" and "reckless disregard for the safety of others," *Beeman v. State* (1953), 232 Ind. 683, 115 N.E.2d 919; "reprehensible conduct" and "heedless disregard of the consequences," *Hibschman Pontiac, Inc. v. Batchelor* (1977), 266 Ind. 310, 362 N.E.2d 845.

Thus, to affirm the award, in this case, we must say that by continuing Coleman in his employment, under the circumstances known, Hinkley subjected other persons to probable injury, with an awareness of such impending danger and with heedless indifference of the consequences. To do so defies reason and logic and would be to announce a policy of rendering employers liable for punitive damages whenever they are aware of an employee's hazardous activity but fail to discharge him and harm

subsequently results. Plaintiff asserts that, under such circumstances, an award of punitive damages is "in the public interest." As previously stated, advancement of the public interest is the basis for and hence a prerequisite to such an award, so we understand the need to advance such argument. From a more objective viewpoint, however, it is our considered opinion that public policy could not tolerate the mass unemployment that would flow from the discharge of every employee known to have engaged in some activity which, if continued, would subject others to undue risk.

■ We find Plaintiff's evidence woefully lacking under the *Armstrong* rule. Although Defendant is liable under the doctrine of respondeat superior for Coleman's negligence, we would be hard pressed to find that continuing Coleman's employment with the stern warning and threat of discharge, following his infraction of the safety rule, was even negligence, let alone willful and wanton misconduct—heedless indifference. There is nothing whatever in the evidence from which it may be reasonably inferred that Coleman probably would not abide by Hinkley's emphatic order not to carry the pen-gun; and an award of punitive damages simply leaves us aghast. Judge Shields was correct in writing in her dissent to the opinion of our Court of Appeals that, " * * * as a matter of law, the evidence is insufficient to support an award of punitive damages under the standard of clear and convincing proof." 461 N.E.2d at 705.

There is simply nothing about the circumstances of Coleman's initial employment, his training or his retention following notice of his fear of dogs and his breach of a company safety rule to alleviate his fear, that a reasonable man could say is inconsistent with the hypothesis of errors in judgment—unaggravated negligence at the very most. If it may be said that there is some degree of consistency in Hinkley's laxity with a hypothesis of wantonness, there is, nevertheless, nothing about it that may reasonably be said to be inconsistent with the hypothesis of mere negligence. The presumption favoring the Defendant, therefore, cannot have been overcome. This decision does not involve a weighing of the evidence but only a review, a search, a sifting to ascertain if there was any at all from which a reasonable man, employing the *clear and convincing rule*, could have found that Hinkley's conduct was willful and wanton. We have found none, and the judgment is, therefore, contrary to law.

■ In view of our decision, we are not required to respond to Defendant's assignment that the trial court gave erroneous instructions upon the issue of punitive damages. However, it is appropriate to indicate here that, assuming that punitive damages are warranted by the evidence, a plaintiff is entitled to have the jury instructed that they may be awarded, if it finds that the defendant was guilty of the obdurate conduct charged. And a defendant is entitled to have it instructed that the purpose of such an award is not to reward the plaintiff but to penalize or punish the defendant, for the public good, and that the defendant is presumed to be innocent of that charge until proven guilty by clear and convincing evidence. If, as will usually be the case, the claim is dependent entirely upon circumstantial evidence, a defendant will be further entitled to an appropriate instruction advising the jury that before it can award punitive damages upon circumstantial evidence alone, such evidence must be "clear and convincing" and exclude the hypothesis that the defendant's conduct, for which it has awarded compensatory damages, although wrongful, was, nevertheless, not committed with the element of obduracy charged.

We observe that Plaintiffs have attempted to assign a cross error addressed to the trial court's denial of a tendered instruction and the giving of a modified instruction, both of which regarded the jury's prerogatives in assessing compensatory damages for pain and suffering and for loss of consortium. In support of this claim, it is argued that the charged errors were harmful in that the awards were inadequate.

These assignments are not properly before us. Such issues were presented to the trial court only conditionally, by way of a response under Trial Rule 59(E), to Defendant's motion to correct errors. The response motion expressly stated that additur or a new trial on compensatory damages were sought *only if the court reduced or set aside the award for punitive damages*. Plaintiffs expressly waived their right to a consideration of their motion, and it is clear, from the following quoted finding by the trial court, that it recognized the conditional nature of the motion and did not consider it upon its merits: "(2) That due to the fact that the Defendant's Motion to Correct Errors is denied, the Plaintiff's request for additur and a new trial in (sic) the issue of compensatory damages should be denied." (Tr. Vol. V p. 710.)

We will not review claims of error not preserved. *Lawrence v. State* (1980), 274 Ind. 468, 412 N.E.2d 236; *Misenheimer v. State* (1978), 268 Ind. 274, 374 N.E.2d 523. We observe, however, that were this assignment properly before us, the burden of showing error would be upon Plaintiffs and that the awards of compensatory damages were well within the evidence.

The judgment of the trial court appealed from is reversed. The cause is remanded, and the trial court is instructed to vacate the judgment for punitive damages.

GIVAN, C.J., and DeBRULER and PIVARNIK, JJ., concur.

SHEPARD, J., not participating.