**KROGER FOOD STORES, INC.,**
Appellant–Defendant,

v.

**Judith M. CLARK, Appellee–Plaintiff.**

No. 09A01–9111–CV–342.

Court of Appeals of Indiana,
First District.

Sept. 9, 1992.

Rehearing Denied Nov. 4, 1992.

Jim A. O'Neal, Ice Miller Donadio & Ryan, and Thomas L. Davis, Locke Reynolds Boyd & Weisell, Indianapolis, for appellant-defendant.

Jay T. Hirschauer, Hirschauer & Hirschauer, Logansport, for appellee-plaintiff.

ROBERTSON, Judge.

The plaintiff-appellee Judith M. Clark filed a false arrest and malicious prosecution cause of action against the defendant-appellant Kroger Food Stores, Inc. After a bench trial, Clark was awarded compensatory damages in the amount of $83,525.80, and punitive damages in the amount of $1,000,000. Kroger appeals from that judgment. We affirm.

Kroger argues three issues [1]:

1. whether the trial court's findings of fact and conclusions of law as to lack of probable cause are erroneous as a matter of law;

2. whether the trial court's findings of fact and conclusions of law, that the prima facie presumption of probable cause afforded Kroger had been rebutted, are erroneous as a matter of law; and,

3. whether the record supports by clear and convincing evidence the trial court's conclusions that Kroger engaged in a "witch-hunt", a "vendetta", a "single-minded attack", and "conspiracy" against Judy Clark so as to justify an award of $1,000,000 in punitive damages?

Clark, who was hired by Kroger in 1974 as a cashier, had worked at several Kroger stores during her fourteen-year tenure, the most recent being the Kroger store in Monticello. As an "old contract" employee, she received twice as much pay and substantially better benefits than cashiers hired at a later date. Clark had a history of medical problems which required that she take leaves of absence from work, caused her to be disfigured, and ultimately led to a pronouncement by the Social Security Administration that she was disabled.

In late 1987, Kroger commenced one of its "K-card" promotions. Each week that a customer purchased $15 in groceries his or her card would be appropriately marked. If the customer had the card marked for seventeen or more weeks out of a twenty-week period the card could be redeemed for $25 worth of groceries. Although the Kroger company instructed its participating stores that K-card exchanges were to be recorded separately from the rest of a transaction as cash, these instructions were never passed on to the Monticello cashiers by head cashier, Andrea Dubes.

Clark, as well as other cashiers, frequently filled in the name and address section of the card for customers until a memorandum prepared by Dubes and circulated by store manager, Jim Slavens, prohibited that practice and required the customers to fill in the address portion of the card themselves. Slavens instituted the policy well into the promotion, after the redemption period had begun, about the same time that Dubes began to actively investigate her suspicions that Clark had been exchanging counterfeit K-cards for cash.

Dubes suspected Clark of theft because Clark had turned in K-cards which did not appear to Dubes, and Kroger management, to be worn,[2] appeared to be folded in the same place, and bore a Kroger stamp which appeared to be fading over successive weeks. In early January, 1988, at the suggestion of risk management, Clark's cash drawer was isolated and Dubes required the cashiers to list each check, K-

---

**1.** Kroger states a fourth issue, namely, whether the rebuttable presumption that Kroger's actions even if tortious were not wicked precludes an award of punitive damages; however, Kroger does not argue this issue independently of its third issue which challenges the sufficiency of the evidence to sustain the award. Accordingly, we will not undertake a separate discussion of the fourth issue either.

**2.** Dubes testified at the criminal trial that the cards which initially aroused her suspicions appeared to be too worn.

card, and exchange of food stamps separately. Clark's drawer was never short and the number of K-cards she submitted matched her pick-up slip. Dubes examined the register-generated detail tape from Clark's register, which showed the amount of each transaction and whether the customer paid by cash or check (the only two options available). Dubes found several transactions which she could "safely" say involved K-card transactions but for a number of consecutive days, could not identify the appropriate number of transactions in which K-cards *could be said* to have been exchanged. Dubes concluded that the detail tapes supported her suspicion that Clark had been stealing.

Dubes was the only person on behalf of Kroger or the State to examine the entire detail tape. She related her findings to store management and the store's investigators, who had no independent understanding of the tape. Dubes examined only one other employee's detail tape. That employee rang in all of her K-card transactions as Kroger management had expected. White County Deputy Sheriff Ron Clark, a part-time security officer, watched Clark through binoculars from an upstairs office as did the store's managers. This occurred over a five or six week period, but none saw Clark remove money from the cash register. Dubes also checked the names and addresses listed on some of the K-cards and found several discrepancies.

Clark denied the alleged theft but was never given an opportunity to explain to any of her supervisors. She was tried of theft and acquitted.

■■■ When the trial judge enters extensive findings of fact in support of the judgment as was done here, this court applies a two-tiered standard of review which involves first determining whether evidence supports the findings and then determining whether the findings support the judgment. *W & W Equipment Co. v. Mink* (1991), Ind.App., 568 N.E.2d 564, 569, *trans. denied.* The findings and judgment will be set aside only if they are clearly erroneous. *Id.* In determining whether

the findings and judgment are clearly erroneous, this court will not reweigh the evidence or judge the credibility of the witnesses. *Id.* In making the determination of whether the findings and judgment are clearly erroneous we will only consider the evidence in the record which supports the judgment along with the reasonable inferences to be drawn therefrom. *Id.* Finally, we will disturb the trial court's findings only if the record is devoid of facts or inferences to support the findings. *Id.*

## I.

■■■ In a claim for malicious prosecution, a plaintiff must prove: 1) that the defendant instituted, or caused to be instituted, a prosecution against the plaintiff, 2) the defendant acted maliciously in doing so, 3) the prosecution was instituted without probable cause, and 4) the prosecution terminated in the plaintiff's favor. *Johnson County REMC v. Burnell* (1985), Ind.App., 484 N.E.2d 989; *K Mart Corp. v. Brzezinski* (1989), Ind.App., 540 N.E.2d 1276, *trans. denied.* Kroger challenges the trial court's conclusion that its conduct was malicious. It concedes that malice may be inferred from a total lack of probable cause, *Board of Commissioners of Hendricks County v. King* (1985), Ind.App., 481 N.E.2d 1327, 1329, but argues that the trial court's finding there was no probable cause to arrest and charge Clark is not supported by the evidence and is clearly erroneous as a matter of law.

■■■ The trial court's factual findings include two findings that Dubes and Kroger had no probable cause to believe that Clark had committed a criminal act. Another finding states that reasonable inquiry would not have induced any person to believe that Clark had committed the crime of theft. The trial court's finding Number 24, which Kroger specifically attacks states:

Andrea Dubes believed that [Clark's] detail tapes did not evidence the number of K-cards turned in (as redeemed) by [Clark] with her corresponding pick-up sheets. The basis for her belief was that K-cards redeemed were to be isolated on the detail tapes as independent cash

items. This belief is totally rebutted by the testimony of [Clark] and of [Kroger's] witnesses Sharon Quisenberry (who testified she rang up redeemed K-cards as straight cash), Andrea Dubes (who admitted there was no posted policy regarding how to ring up redeemed K-cards and that she never asked [Clark] or any other cashier how redeemed K-cards were being rung up), and Margaret (Meg) Harmon (who testified there was no posted policy).

The trial court also found in finding 26: Given that redeemed K-cards were rung up as straight cash items by cashiers, including [Clark], and that there was no posted policy prohibiting same, Andrea Dubes' suspicions regarding detail tape pick-up sheet "inconsistencies" do not rise to the level of probable cause. They do not rise to the level of reasonable belief. They rise only to the level of ignorance or vendetta.

These factual findings are plainly supported by the record. (R. 957, 959, 1098, 1141, 1143). Indeed, co-manager Meg Harmon testified that it was "probable" a straight cash transaction on Clark's detail tape was a K-card transaction.

■ Probable cause to commence criminal proceedings exists when a reasonable inquiry would induce a reasonably intelligent and prudent person to believe that the accused committed the crime charged. *King*, 481 N.E.2d at 1329; *McQueen v. City of Indianapolis* (1980), Ind.App., 412 N.E.2d 138, 140. It exists when, from an apparent state of facts, a reasonably intelligent and prudent person would be induced to act as did the person who is charged with the burden of having probable cause to act. *Satz v. Koplow* (1979), Ind.App., 397 N.E.2d 1082, 1084–85.

Andrea Dubes conceded that she had never instructed the cashiers under her charge on how she expected them to record K-card transactions. She admitted that a K-card transaction could appear on the register tape in a variety of different ways and the only transactions she identified for investigators as K-card transactions were those she could "safely" say were indeed K-card transactions. Had Dubes inquired of her cashiers and in particular, Clark, she would have discovered that the cashiers were not using any single method of registering the transaction. Had any of Kroger's "risk management" employees inquired of the other cashiers, independently reviewed Clark's detail tapes for an alternative explanation, or compared the detail tapes of the other registers, they too would have discovered that the register tapes did not evince a theft. To continue to maintain the belief that an employee had engaged in theft in the face of a simple and "probable" explanation which is readily discoverable and without some evidence that anything had ever been taken is simply not objectively reasonable. *Cf. F.W. Woolworth Co. v. Anderson* (1984), Ind.App., 471 N.E.2d 1249, *trans. denied.*

■ Kroger also takes issue with the trial court's conclusion that the efforts of their investigators added nothing, characterizing this finding as "absurd." In fact, the record establishes that other than interview Clark, check on some of the addresses written on the cards, and watch Clark for a period of time, Kroger's investigators did nothing other than retrace the steps taken by Dubes. Although Kroger's investigators examined the register tapes, pick-up slips, and cards, they relied entirely on Dubes' explanation of the register tapes without independently attempting to verify her reading of them. As a consequence, their "review" of the documentation did nothing to substantiate Dubes' suspicions. The admission obtained by investigators from Clark that she may have improperly rung up K-card transactions is at best an indication that she violated store policy, which it turns out had never been communicated to the cashiers by Dubes. Kroger concedes that its surveillance of Clark proved fruitless. Its efforts to match Clark's handwriting with the handwriting on some of the cards proved nothing because cashiers were permitted to write in names and addresses for their customers.

■ Kroger points to the cards themselves and the qualities which its employee

identified as indicative of fraud as a basis for concluding that its belief in Clark's guilt was reasonable. In particular, Kroger challenges the evidentiary support for the trial court's finding number 17, that "... Dubes looked at other cashier's K-cards and found some having the same features as Plaintiff's K-cards; however, she focused her suspicion/attention on only Plaintiff." The second portion of this compound finding is amply supported by Dubes' own testimony. However, in our review of the record, we have been unable to find testimony to the effect that Dubes found other cashier's cards with similar features. To the contrary, on two occasions Dubes testified that she looked at other cashier's cards and did not find cards with similar features. (R. 774, 933–34).

Even so, the inaccuracy contained in this finding does not render the trial court's judgment clearly erroneous. The cards which aroused Dubes' suspicions were never introduced into evidence; they were all turned in by Clark before she was alleged to have stolen from Kroger. Indeed, Dubes testified at the criminal trial that the cards which initially aroused her suspicion were turned in by Clark during an earlier promotion, that she kept holding the cards "hoping something would come up," and suspected Clark "from the very beginning." Presumably, Kroger did not introduce the suspicious cards because it could not identify them or no longer had them. Be that as it may, having failed to produce the cards themselves, Dubes' own subjective interpretation of them is not *objective* evidence of Kroger's reasonable belief in Clark's guilt. The fact remains, as the

trial court found, that Dubes singled out Clark. Kroger never developed probable cause. This finding is supported by the other evidence of record and the trial court's other findings.

Finally, in passing, we note that the element of malice may be inferred from a total lack of probable cause, from the failure to make a reasonable or suitable inquiry, and from a showing of personal animosity. *F.W. Woolworth*, 471 N.E.2d 1249, 1254. The facts, as found by the trial court and established at trial, show a course of conduct designed to implicate Clark in disregard of the objective circumstances which would have manifested themselves had a suitable investigation been undertaken. Despite Dubes' denials of animosity toward Clark there is also evidence in the record that Clark had reported Dubes to union officials and that Dubes resented Clark as a consequence.

## II.

Kroger maintains that the trial court's finding, that Clark had rebutted the prima facie presumption of probable cause in its favor, is clearly erroneous. While a judicial determination of probable cause in a criminal proceeding may constitute prima facie evidence of probable cause in a subsequent action for malicious prosecution, that evidence may be rebutted by other evidence showing that the finding of probable cause was induced by false testimony, fraud, or other improper means such as the withholding of material facts. *Lazarus Dept. Store v. Sutherlin* (1989), Ind.App., 544 N.E.2d 513, 520, *trans. denied; Johnson County REMC*, 484 N.E.2d at 992.[3]

---

**3.** The dissent makes the assertion, on page six infra, that "[a]n examination of the evidence ... clearly shows that the finding of probable cause for the criminal prosecution was not based upon bare allegations by Kroger employees which were ultimately proven to be contrived or untruthful ..." The author also "assumes" that the judge who made the probable cause finding was a reasonably intelligent and prudent person.

We obviously have no quarrel with the proposition that the judge who made the probable cause determination is a reasonably intelligent and prudent person; the problem lies in making an assumption rather than *reviewing* the deter-

mination which was made. Ultimately, the question for the trial judge in this civil action was the weight to be assessed the earlier determination of probable cause, and in resolving that question, the trial court must have inquired whether, under the circumstances of this case, a determination of probable cause was objectively reasonable. Applying the appropriate standard of review, the evidence most favorable to the judgment (indeed, the only evidence of record concerning the evidence before the judge who made the probable cause determination), is that *none* of the evidence recited by the dissent as a basis for a determination of probable cause was before the judge who made the probable cause

The record reflects that the probable cause determination was based solely upon the affidavit of part time Kroger investigator and White County Deputy Sheriff Ron Clark without the benefit of an evidentiary hearing. In three paragraphs, the affiant swears that he was personally informed by Gene Tomey (another part time Kroger "risk management" employee and police officer) that Clark exerted unauthorized control over currency belonging to Kroger by "falsifying Kroger's Christmas Club Cards and redeeming them for U.S. currency;" that this information was credible because Tomey "spoke with personal knowledge and the investigation uncovered facts which support his statement;" and that Tomey was reliable and credible because Tomey "spoke with personal knowledge and the investigation uncovered facts which support his statement."

Apart from the fact that the affidavit on its face fails to specifically set forth *the facts* constituting the affiant's belief in his assertion of probable cause, the veracity of his informant and the basis of the informant's knowledge, or contain the corroborating circumstances gained from independent investigation which might provide an objective basis for evaluating the totality of the information contained in the application for the warrant, the affidavit contains the blatant misrepresentation that Gene Tomey had personal knowledge of the circumstances averred in the affidavit and that his investigation had uncovered facts which support the assertion made in the affidavit. At no time did Gene Tomey, or anyone else, ever observe Clark falsify K-cards or take cash. Tomey's knowledge of Clark's purported theft was gained solely from other Kroger employees, not from his own firsthand observations or from facts uncovered during his investigation. As we have already discussed above, neither Clark nor Tomey contributed any evidence of value from their "investigations." The trial court clearly did not err in its conclusion that Clark had successfully rebutted Kroger's prima facie case which relied upon judicial process.

### III.

Kroger also argues that a reasonable trier of fact could not have found conduct supporting punitive damages by clear and convincing evidence. Specifically, Kroger challenges the trial court's findings that it had engaged in a "witch-hunt," a "single-minded attack," a "conspiracy" and had "a vendetta" against Clark. Kroger contends that the evidence showed only negligence or noniniquitous human failing.

We have already recited the evidence which supports the trial court's description of Kroger's actions. Kroger knew that K-card fraud was occurring but focused all of its attention on a single person, Clark. The individual entrusted with primary responsibility for investigating Clark was Dubes, another union employee, which the evidence discloses had reason to dislike Clark because Clark had reported Dubes, on more than one occasion, to union officials

determination. Court reporter, Kathy Sue Clear, testified that evidentiary hearings are not routinely held in the White Superior Court when a warrant on a misdemeanor is sought, (R. 289, 300) and that, to the best of her knowledge, there was never a probable cause hearing in Clark's case. (R. 297). "The prosecutor brings up the probable cause affidavit and the charging information." (R. 300). There having been no evidentiary hearing, the only "evidence" offered to the judge in support of the determination was the barebones affidavit, the content of which is recited infra on page 11. In a criminal context, the author of the dissent would be the first to recognize that not only is this affidavit deficient but that it is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. *See, generally, Everroad v. State* (1991), Ind.App., 570 N.E.2d

38 (Sullivan, J. dissenting), *superseded in part,* (1992), 590 N.E.2d 567, 571 (Affidavit relied upon hearsay without the requisite information establishing credibility, factual basis and corroboration).

In short, the dissent's entire analysis overlooks the critical fact that, whatever the evidence in Kroger's possession, that evidence was not offered to the judge in support of the affidavit. And, we reiterate, as we state above, that the few representations of fact which were made in the affidavit have now been shown to be patently false. Clark's burden was not to establish that "the physical evidence" in Kroger's possession was falsified but to refute the presumption of validity accorded the earlier determination of probable cause. By showing an absence of truthful, factual support for the determination, Clark plainly has met that burden.

for having violated union work rules. Dubes expressed her resentment of Clark to another employee, indicating that she would "pull [Clark's] hair out." Dubes testified at both the civil and criminal trials that she set out to prove that Clark had done something wrong when the promotion began.

 We reiterate that the standard for reviewing the sufficiency of the evidence to sustain a punitive damage award does not differ from any other sufficiency of the evidence question. We will affirm a judgment of punitive damages if, considering only the probative evidence and the reasonable inferences supporting it, without weighing evidence or assessing witness credibility, a reasonable trier of fact could find such damages proven by clear and convincing evidence. *Bud Wolf Chevrolet, Inc. v. Robertson* (1988), Ind., 519 N.E.2d 135, 137. If it can be said that either of two conclusions can be reasonably drawn from the evidence, it is immaterial, upon appeal, that one of such conclusions appears to be more likely than the other. We are bound by the finding of the trier of fact. *Orkin Exterminating Co. v. Traina* (1986), Ind., 486 N.E.2d 1019, 1022. Hence, it matters not whether we would have also concluded that Kroger's managerial employees engaged in a conspiracy with Dubes. A reasonable person could conclude from the evidence of Kroger management's frustration with Clark's frequent absences and the financial efficacy of replacing Clark, that Kroger employees conspired to prove Clark guilty of theft.

 We have also already found the evidence sufficient to support a finding of malice. However, punitive damages may also be awarded upon evidence that Kroger consciously and intentionally engaged in misconduct which, under the existing conditions, it knew would probably result in injury to Clark. *Id.* at 1023; *Bud Wolf Chevrolet*, 519 N.E.2d at 137. Kroger employee Dubes knew of Clark's health problems, disfigurement, and the damage termination and prosecution for theft would do to Clark's reputation as a trustworthy employee and cashier. She also knew Kroger could replace Clark at substantially less cost to the company. Nevertheless, Dubes set out to prove Clark had done something wrong. While some of Kroger's employees may have only acted negligently in relying upon Dubes' interpretation of the evidence, Dubes' actions were not merely negligent. The trial court did not err in awarding punitive damages on this evidence.

Judgment affirmed.

BAKER, J., concurs.

SULLIVAN, J., dissents with separate opinion.

SULLIVAN, Judge, dissenting.

I dissent from the majority's affirmance of the award of compensatory and punitive damages.

## I. *Probable Cause*

In order to succeed upon her claim of malicious prosecution, it was incumbent upon Clark to prove that 1) the defendant instituted a prosecution against the plaintiff, 2) with malice, 3) and without probable cause, and 4) that the prosecution ultimately terminated in favor of the plaintiff. *Willsey v. Peoples Federal Savings and Loan Ass'n of East Chicago* (1988) 4th Dist. Ind.App., 529 N.E.2d 1199, *trans. denied.* I do not agree with the majority that Kroger was without probable cause to prosecute Clark for theft.

Probable cause in this context exists when "facts found on a reasonable inquiry would induce a reasonably intelligent and prudent person to believe the accused committed the crime charged." *Duvall v. Kroger Co.* (1990) 4th Dist. Ind.App., 549 N.E.2d 403, 405. Although normally an issue of fact for the jury, probable cause is a matter for the court to decide when the facts are not in dispute. *Id.* It is important to note that "probable cause" is not synonymous with "sufficient to sustain a conviction." *See, e.g., Willsey, supra* (fact that defendant ultimately did not prevail in prosecution did not necessarily lead to conclusion that defendant was without probable cause to prosecute). Moreover, in Indiana,

"a judicial determination of probable cause in a criminal proceeding constitutes prima facie evidence of probable cause in a subsequent malicious prosecution suit." *Johnson County Rural Electric Membership Corporation v. Burnell* (1985) 4th Dist. Ind.App., 484 N.E.2d 989, 992.

Such prima facie showing, based upon a judicial finding of probable cause, may be rebutted by evidence showing that the finding of probable cause was induced by false testimony or fraud or other improper means such as a withholding of material facts. *Lazarus Department Store v. Sutherlin* (1989) 1st Dist. Ind.App., 544 N.E.2d 513, 520, *trans. denied; K Mart Corp. v. Brzezinski* (1989) 3d Dist. Ind. App., 540 N.E.2d 1276, *trans. denied.* The prima facie case cannot be overcome by showing a negligent failure to conduct a more thorough investigation. *K Mart Corp., supra.*

.The majority states that the affidavit of Officer Ron Clark, upon which the arrest warrant was issued, was defective, thus destroying the *Burnell* presumption. *See* majority opinion, footnote 3. The majority opines that acceptance of the validity of the instant affidavit is inconsistent with this author's position as stated in *Everroad v. State* (1991) 1st Dist. Ind.App., 570 N.E.2d 38 (Sullivan, J., dissenting), *aff'd in part, vacated in part,* (1992) Ind., 590 N.E.2d 567. I respectfully disagree.

In *Everroad,* the police searched the defendant's house seeking a stolen television set, pursuant to a search warrant. The search proved unsuccessful. However, while they were searching, the police observed what appeared to be contraband throughout the house. A second search resulted in the seizure of a substantial quantity of controlled substances and drug paraphernalia. In dissent to the majority's affirmance of the defendant's conviction upon drug-related charges, I concluded that the affidavit which resulted in the original search warrant "wholly failed to comply with the requirements of the statute in effect at the time in question." *Everroad, supra,* 570 N.E.2d at 57. I.C. 35–1–6–2, the statute in force at the time, required

that "the affidavit shall contain reliable information establishing the credibility of the source and of each of the declarants of the hearsay and establishing that there is a factual basis for the information furnished." I concluded that the affidavit did not sufficiently establish the credibility of the source of the affiant's information:

"Although the affidavit asserted that the source was 'allegedly present' at the time of the theft and subsequent sale of the TV 'to Greg Everroad', it did nothing more than recite an unsupported conclusion that the unnamed source was credible. The affidavit was inadequate on its face." *Everroad, supra,* 570 N.E.2d at 57.

The fatal defect in the *Everroad* affidavit was its failure to establish the informant's credibility.

The affidavit in the instant case is governed by I.C. 35–33–5–2 (Burns Code Ed. Supp.1992), and I.C. 35–33.5–2–3 (Burns Code Ed.Supp.1992). Both of these statutes require that an informant's credibility must be established if an affidavit is based in whole or in part upon the informant's information. An informant's credibility may be established in either of two ways. First, it may be established if the affiant states that the informant has been a reliable source in the past. *See, e.g., Tinnin v. State* (1981) 275 Ind. 203, 416 N.E.2d 116. Second, it may be established if the affiant states that some of the informant's information has been independently corroborated. *See, e.g., Suggs v. State* (1981) Ind., 428 N.E.2d 226.

In the instant case, the probable cause affidavit states that "the investigation uncovered facts which support [Officer Tomey's] statement." Both Officer Tomey and Officer Clark conducted investigations prior to the issuance of the arrest warrant. Although it may be argued that "the investigation" may refer to either investigation, the only logical interpretation is that Officer Clark is referring to his own investigation. To interpret it otherwise would ascribe to the statement a meaning which is nonsensical in this context—i.e., that Officer Tomey is credible because the informa-

tion he (Tomey) provided is corroborated by Officer Tomey's investigation. Rather, this statement in the affidavit amply reflects independent corroboration of facts supplied by Officer Tomey, thus establishing his credibility. Therefore, the problem giving rise to my dissent in *Everroad*, that is, the lack of verification of an informant's credibility, is simply not present here.[4]

In the instant case, Kroger presented evidence that the criminal prosecution of Clark was based upon a judicial finding of probable cause, thus meeting its prima facie burden under *Burnell, supra.* It was then incumbent upon Clark to present evidence that the judicial finding of probable cause was based upon Kroger's (through its employees) false testimony, fraud, or concealment. An examination of the evidence in the instant case clearly shows that the finding of probable cause for the criminal prosecution was not based upon bare allegations by Kroger employees which were ultimately proven to be contrived or untruthful, nor upon physical evidence which was later shown to have been fraudulently manufactured or altered by Kroger. Rather, the court issued the arrest warrant upon the strength of an affidavit submitted by a police officer whose investigation included an examination of the K-cards in question, the detail tapes, the pick-up sheets, and interviews with Clark and other Kroger personnel. I therefore deem this affidavit to be adequate, although perhaps marginally so. However, I also conclude that there are sufficient facts, even without the *Burnell* presumption, to find probable cause as a matter of law.

Beverly Shirar, an office cashier, first suspected that someone was submitting or knowingly accepting fraudulent K-cards because of the cards themselves, without regard to who may have been turning in the suspicious cards. In fact, Shirar had no idea in the beginning whose drawer the suspicious cards came from. Her suspicion was aroused because certain cards were turned in that looked almost new—a condition inconsistent with the fact that the card must necessarily have been in use for at least seventeen weeks. In addition, a number of the suspicious cards contained the same fold lines, suggesting that they had all been folded together. Shirar also noted that several of the cards contained stamp marks which became progressively lighter in sequence, suggesting that the stamp marks had been made one after another at the same time, as opposed to one at a time at weekly intervals. Finally, at the top of each K-card the customer's name and address was written. Many of the names and addresses written on the suspicious K-cards were written in what appeared to be Clark's handwriting.

Kroger personnel attempted to contact these people and discovered that some of

4. The sufficiency of the affidavit is further bolstered by the fact that both the informant and the affiant were police officers. At the time of their respective investigations, Tomey was a Marion County Deputy Sheriff and Ron Clark was a White County Deputy Sheriff. Although it is true that Tomey's entire investigation, and at least part of Clark's, were performed while in Kroger's employ and not in their capacity as law enforcement officers, this does not negate the fact that they were deputy sheriffs. In fact, Clark signed the probable cause affidavit as "Deputy Ron Clark".

In *Spears v. State* (1978) 270 Ind. 12, 383 N.E.2d 282, the defendant argued that a search warrant was defective because it was based upon hearsay. In upholding the sufficiency of the affidavit, our Supreme Court noted:

"[S]ince the officer who was swearing out the affidavit for the search warrant was investigating the same robbery as the other officers (of the same police department) who actually talked to [the witnesses who supplied eye-witness testimony], there is no totem pole hearsay problem here." 383 N.E.2d at 284. The above indicates that information communicated between law enforcement officers participating in an investigation is not subject to the same credibility concerns as is the information gleaned from other sources. *See also Tope v. State* (1977) 266 Ind. 239, 362 N.E.2d 137, *cert. denied*, 434 U.S. 869, 98 S.Ct. 209, 54 L.Ed.2d 146 (affidavit held sufficient that contained hearsay confession made to police; the confessor was involved in the crime, and the affidavit stated that the affiant, a police officer, based upon his personal investigation of the crime, felt that such person was speaking with personal knowledge of the facts of the crime); *Wells v. State* (1979) 1st Dist. Ind.App., 397 N.E.2d 1250 (police officer's testimony could be used to support search warrant when he was supplied information by second officer, even though first officer failed to assert that second officer was a credible source of information).

the names and addresses were false. Two of the names written upon the cards were those of actual customers who, when contacted, denied that they had ever participated in the program, much less turned in a card. One of these was a family whom Clark had visited and whose address was thus known to her. Clearly, someone had falsified several K-cards, and these cards all were turned in at Clark's register, as evidenced by her initials upon the cards. Shirar brought the suspicious cards to Dubes's attention.

Dubes was instructed by her superiors to investigate the matter, whereupon a policy was instituted requiring that each cashier work only out of her own drawer. This policy would aid Kroger in isolating and identifying any wrongdoer. Because all of the suspicious K-cards came from Clark's drawer, as evidenced by her initials which she wrote upon the cards, she was periodically placed under clandestine surveillance. She was never observed placing a K-card into her drawer and removing $25.00 in cash. However, during a five-day period her pick-up sheets were checked against her detail sheets, and in that time her drawer contained a total of 28 K-cards which could not be accounted for upon review of the detail sheets. In other words, 28 of the K-cards turned in by Clark could not be accounted for upon review of the customer transactions, as reflected on her register tapes.[5]

Dubes, the head cashier, testified that the K-card transactions were to be rung up differently than normal cash or check transactions, so that a K-card transaction would be apparent upon review of the detail sheets. Clark argued at trial that a K-card transaction may not have been recognizable as such on the detail sheet if it were rung up as a regular cash or check transaction; she claimed that she had rung them up in just this manner. However, the fact remains that a majority of the K-cards reflected on *her* pick-up sheets from those days were accounted for on the detail sheets; that is, most had been rung up in the manner that Kroger had requested.

The above evidence clearly is sufficient to induce a reasonably intelligent and prudent person to believe that Clark was improperly using the K-cards for her own personal financial gain. It may be assumed that the judge who made the probable cause finding in issuing the arrest warrant was just that, a reasonably intelligent and prudent person. Indeed, it is this assumption which underlies the rule in *Burnell, supra,* that a judicial finding of probable cause constitutes prima facie evidence of the existence of probable cause.

The determination of probable cause having been made (and, properly so), it was incumbent upon Clark to rebut Kroger's prima facie evidence by showing that the K-cards, detail sheets, and register tapes had been falsified or that some other fraud or material concealment occurred. In fact, Clark never contended that the physical evidence was falsified, but rather that the anomalies could legitimately be explained. An explanation consistent with innocence does not destroy the probable cause. The fact that the jury ultimately had reasonable doubt as to whether Clark had engaged in criminal conduct does not negate the fact that the evidence gave rise to a sufficiently reasonable belief to place her on trial for a crime.

## II. *Malice*

In addition to the presence of probable cause, Clark's claim of malicious prosecution fails for want of another essential element—malice.

Malice may be inferred in several circumstances. It may be inferred from a total lack of probable cause. *Board of Commis-*

---

5. The majority also notes that "Clark's drawer was never short." Opinion at 1087. Although true, this fact is irrelevant to the issues. A K-card, in effect, represented a $25.00 bill in a cashier's drawer. The charge against Clark was that she placed falsified K-cards in and took $25.00 cash out. Thus, whether Clark did or did not so act, her drawer would always "balance" in the sense that it would contain the appropriate amount, comprised of a combination of K-cards and cash.

*sioners of Hendricks County v. King* (1985) 1st Dist. Ind.App., 481 N.E.2d 1327, 1329. Obviously, in view of my conclusion that there was sufficient probable cause to prosecute, I cannot infer malice upon this basis.

It has been held that malice may be inferred from failure to conduct a reasonable or suitable investigation. *F.W. Woolworth Co., Inc. v. Anderson* (1984) 1st Dist. Ind.App., 471 N.E.2d 1249, 1255, *trans. denied.* That holding, however, was in the context of the absence of probable cause. To be sure, the *Woolworth* holding was premised upon *Pontius v. Kimble* (1914) 56 Ind.App. 144, 104 N.E. 981, which specifically stated that "there must be proof of both malice and want of probable cause." 104 N.E. at 982. Be that as it may, Clark contended at trial that she was never given adequate opportunity to explain the discrepancies. I disagree. Both Tomey and Officer Clark interviewed Clark as part of their respective investigations, prior to the issuance of the arrest warrant. However, even if Kroger failed to adequately confront Clark with its suspicions in this instance, it does not render Kroger's investigation "unreasonable".

I also disagree with the majority's assertion that the investigations of Tomey and Officer Clark amounted to little more than a rubber stamping of Dubes's investigation. Tomey viewed the K-cards, detail tapes, and pick-up sheets. He also interviewed several Kroger employees, and spoke with Judith Clark. In addition, he attempted to contact the names on several of the suspicious K-cards. At the conclusion of his investigation, he executed the following affidavit:

"1) On Feb. 2, 1988 I conducted an investigation of improper submission of Kroger "K" cards at store J–138, Monticello, In. The target of the investigation centered on Judy Clark, a cashier at the store. Mr. Slavens and the head cashier briefed me on my arrival as to the information and documents that were in their possession. They had obtained several cards that Judy Clark had turned in. All of these cards had Clark's initials on them. The cards in many instances bore the same or similar names and different addresses. The following is a partial list:

(a) K.L. O'Brien..... 2 cards submitted with same name and no address. The cards were tendered Jan 22 & 28.

(b) Kathy Wiles........ RR 4 Logansport, no such person or address exists.

(c) Carl Overpeck....... Addresses of Lafayette & Monticello, no such person or address exists in either city.

(d) Chester Rambald..... 411 Cleveland St., Monticello. This individual was able to be contacted and he advised that neither he or his wife participated in the program.

(e) Mrs. Robert Rambald.... Monticello, In. No such person exists in Monticello.

(f) Bonnie Alspaw.......... Box 116, Burnetsville, In. No such person or box number in that city.

2) Judy Clark had submitted "K" cards on the following dates that were not on her detail tape for that day. It is important to note that due to suspicion of Clark, the head cashier insured that no other employee had access to Clark's register on these days.

| Number of Cards Turned In | Detail Tape Indicates |
|---|---|
| (a) Jan 18, 1988....... 7 | 2 |
| (b) Jan 19, 1988....... 6 | 3 |
| (c) Jan 20, 1988....... 4 | 0 |
| (d) Jan 21, 1988....... 7 | 3 |
| (e) Jan 22, 1988....... 7 | 3 |
| (f) Jan 28, 1988....... 2 | 0 |

This creates a total of twenty two (22) cards unaccounted for, with a total value of five hundred fifty dollars ($550.).

3) I initiated the inteview [sic] of Judy Clark at this point. I asked her several questions as to the procedures of accepting and handling the "K" cards. She responded correctly and was quite aware of the policies and procedures of the program. She totally denied any improprie-

ties with regard to the cards. When confronted with the cards outlined above, she didn't know how they could have been turned in without the detail tape reflecting the transaction. After further converation [sic] she stated that on a couple of occasions she refunded twenty five dollars cash to a customer after the transaction had been rung when the customer found their card. She stated that she asked "Bev" if this was OK, and received authorization to do so. Upon continued conversation Judy changed this from happening a couple of times to up to ten times in the past two months. 4) After approximately three hours of interviewing Clark, it became evident that she would not admit to her action in this incident. She started to tell me about another employee that I should investigate and then stated that she better not say anything.

5) It is my firm belief after reviewing the docummnetation [sic] and interviewing the head cashier, store manager, and Judy Clark that Clark indeed submitted false "K" cards to the store. It is difficult at this point to determine how extensive the damage is. I would estimate at a minimum, five hundred dollars was obtained by Clark through the misuse of the cards.

6) This investigation is open and active pending further review.

Respectfully Submitted,

s/Gene E. Tomey

Gene E. Tomey

Investigator

Risk Management"

Record at 109–10.

Similarly, Officer Clark reviewed all of the aforementioned physical evidence, and interviewed the same people. Following his investigation, in which Tomey did not participate, Officer Clark submitted a report detailing the activities and findings of his investigation to the White County Sheriff and prosecutor; said report is too lengthy to reproduce here. In the report, Officer Clark includes: 1) a description of the K-card program and procedures; 2) a description of the physical evidence; 3) a statement that he participated in the investigation of the names on the K-cards; 4) a description of his interview with Judy Clark. Thus, Clark's claim cannot be premised even partially upon the claim that Kroger's investigation was not sufficiently thorough.

Soon after Kroger became suspicious of Clark, she was the object of clandestine surveillance for several weeks. It would hardly have been good investigatory procedure to alert Clark that she was under suspicion, while at the same time secretly observing her in an effort to "catch her in the act". Neither would a reasonable investigation have necessarily included affording her an opportunity to specifically explain the irregularities after the surveillance period was over, although it may have been preferable to do so. It is indisputable that the tapes and K-cards in question were Clark's, that Clark only sporadically followed preferred procedure for ringing up K-cards, and that many more K-card transactions occurred at her register than at the register of another cashier whose circumstances were very similar to those of Clark. Advising Clark of their suspicions would have done little more than afford her an opportunity to officially deny any wrongdoing, which she in fact was able to do in interviews with both Tomey and Officer Clark, based upon the only defense available to her under the circumstances—that Kroger had drawn incorrect inferences from the circumstantial evidence. Under the circumstances, Clark could not, and ultimately at trial did not, offer any evidence which would materially alter Kroger's position as to her guilt. Accordingly, failure to show her what they believed to be the physical evidence against her did not render the investigation unreasonable.

Malice may be inferred from the existence of personal animosity. *F.W. Woolworth Co., supra,* 471 N.E.2d at 1254. Similarly, it may be presumed, malice may be inferred from the existence of "institutional animosity"; that is, institutional policies and practices aimed at harassing or discharging an individual based upon criteria that are unrelated to job performance.

Clark's claim upon this element is based upon facts which she asserts give rise to two inferences of malice. The first is that Kroger was intent upon releasing her because she was a high-priced, old-contract employee. The second is that Dubes personally disliked Clark. There was not sufficient evidence to establish either proposition.

As to the contention that Kroger wanted to discharge her because of her old-contract employee status, Clark offered as proof that Kroger only examined the detail tapes and pick-up sheets of Clark and Edna Montgomery during the same time period. Clark offers that Montgomery was also an old-contract employee, and contends that this is proof that Kroger was "out to get" old-contract employees. It should be noted here that K-cards from Clark's drawer were checked because they were the only ones that looked suspicious. As for Montgomery, Kroger stated that her tapes were examined because she and Clark had been working as cashiers for Kroger for approximately the same length of time, and both worked essentially the same number of hours during the same time of day. Thus, Montgomery, who was never suspected of any wrongdoing, was monitored only for comparison purposes because her circumstances were more similar to Clark's than were the circumstances of any other cashier.[6] Moreover, one would expect that if this corporate motivation were truly at work, there would have been a noticeable pattern of harassing behavior directed toward old-contract employees. There were sixteen other old-contract employees at Kroger, seven of whom were cashiers, *including Dubes*. Yet, when asked whether they had experienced treatment indicating that Kroger was trying to force them out, all old-contract employees (except Clark) who testified at trial responded in the negative.

Clark also claimed that institutional malice was shown by Kroger's offer to cease the criminal prosecution and pay her $8,000.00 if she agreed to retire. However,

weeks before, Kroger had posted a notice upon the store bulletin·board offering to pay an $8,000.00 lump sum retirement to anyone meeting certain criteria.· Among those who met the criteria were several old-contract employees, including Clark. Several testified that they had been approached individually and had declined the offer; one had accepted. In short, Kroger offered Clark nothing more than that for which she—along with several others—was eligible, with the added benefit to her that she would not face prosecution. Moreover, it strains credulity to suppose that Dubes, herself an old-contract employee, would be a witting instrument of a systematic purge of old-contract employees.

Clark claims that Kroger's institutional animosity may also be inferred from the fact that she had been undergoing expensive treatment for cancer, which caused her to periodically miss work. Thus, Clark argues, Kroger wanted to release her because of her absenteeism, and in order to eliminate having to pay for expensive treatment. Yet, Kroger never denied Clark's requests for benefits, nor did Kroger ever express displeasure to Clark about the amount of money expended upon her treatments. Moreover, Kroger did not refuse even a single request for time off. Clark's assertion upon this point amounts to little more than speculation. The mere fact that Clark underwent expensive medical treatment and missed a considerable amount of time from work, without more, does not support a reasonable inference that Kroger therefore wanted to terminate her employment.

Clark also contends that malice was shown by proof of Dubes's personal animosity toward Clark. Clark notes that she had in the past reported Dubes for alleged union rules violations. The obvious implication is that Dubes bore a grudge which significantly contributed to the investigation of, and ultimate filing of criminal charges against, Clark. However, although this describes a scenario which might explain the genesis of anger toward

---

**6.** It is worthy of note, especially upon the question of probable cause, that all of the K-cards reflected upon Montgomery's pick-up sheets were accounted for on her detail sheets.

Clark on Dubes's part, the "proof" of this ill will is exceedingly thin. None of the Kroger employees who testified at trial were aware of any negative attitudes toward Clark on the part of any Kroger employee. The only evidence of Dubes's feelings were Clark's own subjective beliefs and a multiple hearsay statement offered by Clark, who testified that Ms. Boller, a Kroger employee, had heard Dubes say that she (Dubes) wanted to "pull Clark's hair out". However, Boller was not called as a witness to corroborate the statement, nor was anyone else present when the statement was supposedly made. Although the hearsay statement was not objected to and hence was properly admitted, it nevertheless does not constitute sufficient evidence of a personal vendetta on Dubes's part so as to rebut the prima facie existence of probable cause. In fact, Dubes testified that she and Clark had always been friendly toward one another, an assertion impliedly corroborated by other Kroger employees who testified that to their knowledge everyone at Kroger liked Clark. Moreover, Dubes had recently conducted a periodic evaluation of Clark's job performance, an evaluation which was in large part subjective, and gave Clark consistently superior marks.

The only other "evidence" offered by Clark to show Dubes's dislike of her was the fact of the investigation itself; the implication being that Dubes pursued the investigation with vigor merely because Clark was the subject. In fact, the investigation began when another cashier became suspicious of some of the K-cards and brought them to Dubes's attention. Dubes then pursued the investigation after being so instructed by her superiors.

It therefore appears clear that the record wholly lacks sufficient evidence to demonstrate that Kroger pursued Clark's prosecution based upon a nefarious motive, i.e., malice.

### III. *Standard of Proof for Punitive Damages*

In *Travelers Indemnity Co. v. Armstrong* (1982) Ind., 442 N.E.2d 349, our Supreme Court established the need to prove the right to punitive damages by clear and convincing evidence. *See also Orkin Exterminating Co., Inc. v. Traina* (1986) Ind., 486 N.E.2d 1019 (established clear and convincing evidence rule for all tort cases). Although a precise meaning of "clear and convincing" in this regard has not been forthcoming, the quantum of proof necessary is something more than a mere preponderance. *See Traina, supra*, 486 N.E.2d at 1023 (in punitive damages cases, as in criminal cases, resting entirely upon circumstantial evidence, "the evidence must exclude every reasonable hypothesis of innocence", and is "akin to that required in criminal trials"). In establishing a more rigid standard, the Court made clear its intention that punitive damages not be awarded lightly:

> "[I]t is better to exonerate a wrongdoer from punitive damages, even though his wrong be gross or wicked, than to award them at the expense of one whose error was one that society can tolerate and who has already compensated the victim for his error." *Travelers Indemnity Co., supra*, 442 N.E.2d at 362.

The presumption under the clear and convincing standard is similar to that in a criminal action: the defendant is "cloaked with the presumption that his actions, though tortious, were nevertheless noniniquitous human failings, i.e. that he is *not guilty of the quasi-crime alleged.*" (Emphasis in original) *Traina, supra*, 486 N.E.2d at 1023.

The decision to affirm or deny an award of punitive damages does not involve a weighing of the evidence, but rather "a review, a search, a sifting to ascertain if there was any at all from which a reasonable man, employing the *clear and convincing rule*, could have found [defendant's conduct justified an award of punitive damages]." (Emphasis in original) *Traina, supra*, 486 N.E.2d at 1024. When reviewing the sufficiency of the evidence, appellate courts will affirm an award of punitive damages if, "considering only the probative evidence and reasonable inferences supporting it," a reasonable trier of fact could find that the claimant had proven

elements necessary to justify punitive damages by clear and convincing evidence. *Arlington State Bank v. Colvin* (1989) 1st Dist. Ind.App., 545 N.E.2d 572, 579, *trans. denied.*

The prosecution of Clark was based upon probable cause and was not initiated by reason of malice on the part of Kroger. It necessarily follows that there is no basis for the award of punitive damages, which requires the higher degree of proof.

I would reverse and remand with instructions to enter judgment for Defendant, Kroger Food Stores, Inc.